1996 SD 147

**John McINTYRE, Plaintiff,**

v.

**Hal G. WICK, Defendant.**

**Douglas KAZMERZAK, Plaintiff,**

v.

**Arthur F. FRYSLIE, Defendant.**

**Nos. 19898, 19899.**

Supreme Court of South Dakota.

Original Proceedings

Argued Dec. 20, 1996.

Decided Dec. 31, 1996.

---

7. In *Ramirez,* Swenson testified that he obtained incriminating information in the past by employing the same tactics.

Linda Lea M. Viken of Viken, Viken, Pechota, Leach & Dewell, Rapid City, for plaintiffs.

Scott N. Heidepriem of Johnson, Heidepriem, Miner & Marlow, Sioux Falls, for defendants.

MILLER, Chief Justice.

## ACTION

[¶ 1] Plaintiffs John McIntyre (No. 19898) and Douglas Kazmerzak (No. 19899) filed separate petitions for writs of certiorari seeking our review of the recounts in their respective state legislative elections. We issued a writ of certiorari in each case limited to review of the recount proceedings pursuant to SDCL ch 12–21. Defendants Hal G. Wick (No. 19898) and Arthur F. Fryslie (No. 19899) have asked us to dismiss each action and quash each writ, asserting that the South Dakota House of Representatives has the exclusive jurisdiction to judge the election returns and qualifications of its members. For the reasons set forth in this opinion, we conclude that while the legislature has the exclusive authority to finally determine who will be seated in a legislative election contest proceeding, this Court has the jurisdiction to review irregularities and errors in the tabulation of votes in any recount proceeding.

## FACTS

### # 19898   McIntyre v. Wick

[¶ 2] In the 1996 general election in Legislative District 12, there were four candidates for two seats in the South Dakota House of Representatives: Democrats John R. McIntyre and Dick Casey; and, Republicans Hal Wick and Judy Rost. The vote tally of the election was:

| McIntyre | 4195 | votes | 24.73% |
|----------|------|-------|--------|
| Casey | 3889 | votes | 22.93% |
| Wick | 4191 | votes | 24.71% |
| Rost | 4687 | votes | 27.63% |
| | 16962 | | |

[¶ 3] McIntyre was initially declared to have been elected by a four-vote margin. Wick petitioned for a recount in accordance with SDCL 12–21–12. The recount was conducted in the presence of representatives for both candidates. The results were certified on December 4, 1996, and showed that Wick had been elected by one vote.

| McIntyre | 4191 | votes | 24.71% |
|----------|------|-------|--------|
| Casey | 3891 | votes | 22.94% |
| Wick | 4192 | votes | 24.71% |
| Rost | 4689 | votes | 27.64% |
| | 16963 | | |

[¶ 4] McIntyre delivered timely written notice to Wick of his intention to initiate a legislative contest pursuant to SDCL 12–22–26. Pursuant to SDCL 12–21–47, McIntyre also petitioned this Court for a writ of certiorari to review the recount. This Court issued the writ based upon SDCL 12–21–50. McIntyre disputes Exhibits 37, 32, 33 and 4 while Wick disputes Exhibit 22. *(See* Exhibits attached to this opinion.)

### # 19899   Kazmerzak v. Fryslie

[¶ 5] In the 1996 general election in Legislative District 6 (composed of Clark, Miner, Kingsbury, Hamlin and part of Codington County), the candidates for two seats in the House of Representatives on the Republican ticket were Joe Lakness and Arthur F. Fryslie; the Democratic candidates were Roger Lee and Douglas Kazmerzak. On November 5, 1996, the election night totals gave a thirteen-vote margin to Kazmerzak:

| Lee | 6506 | votes | 32.95% |
|----------|------|-------|--------|
| Kazmerzak | 4526 | votes | 22.92% |
| Lakness | 4198 | votes | 21.26% |
| Fryslie | 4513 | votes | 22.86% |
| | 19743 | | |

[¶ 6] Fryslie asked for a recount. The recount reversed Kazmerzak's win, changing the tally to:

| Lee | 6520 | votes | 33.00% |
|----------|------|-------|--------|
| Kazmerzak | 4519 | votes | 22.88% |
| Lakness | 4195 | votes | 21.24% |
| Fryslie | 4521 | votes | 22.89% |
| | 19755 | | |

[¶ 7] Kazmerzak, like McIntyre, delivered timely written notice of his intention to initiate a legislative contest pursuant to SDCL 12–22–26. He also petitioned this Court for a writ of certiorari to review the recount. SDCL 12–21–47. We issued the writ. SDCL 12–21–50.

[¶ 8] Kazmerzak contends that auditors in Kingsbury, Hamlin, and Clark counties

counted certain ballots differently than auditors in Miner and Codington counties. The problem arose when voters marked the ballot at the head of a column indicating a straight party ticket vote and also marked the ballot next to the name of one candidate in the *same* political party but not the other in the section of the ballot devoted to the legislative race. In two counties, only the candidate whose name was marked was given a vote, while in three counties both of the party's candidates were given a vote pursuant to the straight ticket.

## JURISDICTION

■ [¶ 9] Defendants have moved to quash the writs of certiorari issued to review the recount proceedings and have summarily responded to plaintiffs' contentions by arguing this Court has no jurisdiction whatsoever to act in this arena. We disagree. We hold that while the legislature has the exclusive authority to finally determine who will be seated in a legislative election contest proceeding, this Court has jurisdiction to review irregularities and errors in the tabulation of votes in any recount proceeding.

■ [¶ 10] Defendants rely upon the following language from South Dakota Constitution Article III, § 9:

Each house shall be the judge of the election returns [1] and qualifications of its own members.

1. While the term "election returns" has not been explicitly defined in our constitution, code, or case law, an examination of the authorities below leads to the conclusion that "election returns" are the sheets from precincts and counties showing the total individual votes cast for each legislative candidate. The implements used in carrying out the election such as ballots, ballot boxes, voting machines and poll books, as well as the method of compilation of vote totals, are not included within the term.

In 1889, when South Dakota Constitution Article III, § 9 was enacted, Article XXVI, § 8 required judges of the constitutional election to certify and "return the result" of the election. Article XXVI, § 11 required the Territorial Governor, Chief Justice, and territorial Secretary to "canvass the returns." At that time, PolC 1877, ch. 27, §§ 29, 30 (now SDCL 12–20–21) required the return of "the envelope containing the unofficial returns," an entity separate from ballots, poll books, tally sheet, and registration lists which were also required to be returned to the office in charge of the election. *See also* PolC 1877, ch. 27, § 41 (SDCL 12–20–35); PenC 1877, § 86 (SDCL 12–26–25); SL 2891, ch. 105 § 2 (SDCL 1–8–1(6)). If there is a statutory definition of what constitutes an "election return" it is found or at least described in SDCL 12–20–10 and 12–20–11, both passed in 1911. SDCL 12–20–10 provides:

There shall be furnished by the officer in charge of the election to each voting precinct, for each election, a blank list which shall have space after each candidate's name and after each measure, law, or amendment to be voted upon at such election, in which to enter the number of votes cast in the precinct for each candidate, measure, law, or amendment, together with an envelope addressed to the officer in charge of the election and labeled in plain letters, "Immediate—Unofficial Return—Do not put this in ballot box."

SDCL 12–20–11 provides:

When the vote count is complete, the judges of the election shall enter upon such blank list the true number of votes cast in the precinct for each person, measure, law, or amendment which appears upon the official ballot, and shall enclose the same in the envelope described in § 12–20–10. The judge of election deputed to deliver the election returns to the officer in charge of the election shall return it separate from any other envelopes or wrappers returned at the time he delivers the election returns.

Under SDCL 12–20–37, (passed in 1890), the Secretary of State is required to furnish to the county auditors "envelopes for all returns of votes required to be made to his office, with printed directions on the envelopes as are deemed necessary by the state board of elections for the guidance and direction of the officers in making the returns according to law." It is doubtful these envelopes would be of sufficient size to accommodate ballots, tally sheets and poll books. Under SDCL 12–20–47, also passed in 1890, the Board of State Canvassers "shall open and examine the returns from all the counties[.]"

Early case law from this Court is also of assistance in describing the election process which existed at that time. In *Woods v. Sheldon*, 9 S.D. 392, 69 N.W. 602 (1896), there is a description of what constitutes an election return in a presidential election. It consisted of a abstract of the election results certified by the county auditor. It did not consist of the ballots themselves or even the returns from the individual voting precincts. *Smith v. Lawrence*, 2 S.D. 185, 49 N.W. 7 (1891), deals with an election for sheriff which occurred in the first general election after enactment of our state constitution. At the precinct level, the vote totals were written into the poll books. At the county level the election returns were an abstract or compilation of the county votes from the various precincts. It is clear that at no time were the individual ballots considered to be part of the election returns.

Defendants contend the plain language of this provision makes each house of the legislature the exclusive judge of disputed legislative elections and that the principle of separation of powers forecloses any involvement by the judiciary with this exclusive legislative function. However, such oversimplification would require this Court to ignore jurisdiction and authority granted to it under another provision of our state constitution:

> The Supreme Court shall have such appellate jurisdiction as may be provided by the Legislature, and the Supreme Court or any justice thereof may issue any original or remedial writ which shall then be heard and determined by that court.

S.D. Const. art. V, § 5.

[¶ 11] Here, plaintiffs have specifically invoked this Court's jurisdiction to issue writs of certiorari to review the proceedings of recount boards pursuant to SDCL 12–21–47 and 12–21–48(1). SDCL 12–21–47 provides in pertinent part:

> Whenever any candidate is aggrieved by the final determination made as a result of any recount, he may have the proceedings of such recount board reviewed upon certiorari as provided by this chapter[.]

SDCL 12–21–48(1) provides:

> Original jurisdiction of such certiorari proceeding shall be as follows:
>
> (1) Where the same involves a submitted or referred question voted upon in more than one county, or the nomination or election of presidential electors, United States senator, representative in Congress, *member of the Legislature,* or any state or judicial officer, in the Supreme Court[.]

(emphasis supplied). We decline defendants' invitation to ignore the responsibilities imposed upon us by South Dakota Constitution Article V, § 5 and SDCL 12–21–47 and 12–21–48.[2] Accordingly, we must reconcile these constitutional and statutory provisions with South Dakota Constitution Article III, § 9. *See South Dakota Auto. Club, Inc. v. Volk,* 305 N.W.2d 693 (S.D.1981)(in constru-

ing a constitutional provision court must give regard to whole instrument, must seek to harmonize the various provisions, and must, if possible, give effect to all the provisions). *See also State v. Heinrich,* 449 N.W.2d 25, 27 (S.D.1989)(this Court will uphold the statute unless its unconstitutionality is shown beyond a reasonable doubt); *In re Certification of Question of Law (Elbe),* 372 N.W.2d 113, 116 (S.D.1985)(statutes are presumed to be constitutional).

[¶ 12] We agree with defendants that ascertaining the "plain meaning" is the primary component of constitutional interpretation. *See Poppen v. Walker,* 520 N.W.2d 238(S.D.1994)(Supreme Court has right to construe constitutional provision in accord with its plain meaning). However, many courts have wrestled to define the precise limitations imposed upon their jurisdiction by "plainly worded" constitutional provisions empowering a legislative body to judge the election and qualification of its members. *See, e.g.,* Annotation, *Jurisdiction of Courts to Determine Election or Qualifications of Member of Legislative Body, and Conclusiveness of its Decision, as Affected by Constitutional or Statutory Provision Making Legislative Body the Judge of Election and Qualification of its Own Members,* 107 ALR 205 (1937).

[¶ 13] The United States Supreme Court grappled with this issue in *Roudebush v. Hartke,* 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972). Hartke won election to the United States Senate from Indiana and his opponent, Roudebush, filed a petition for a recount by a judicially appointed commission. Hartke sought a federal injunction against the recount on the basis that it would be prohibited by Article I, § 5, of the Constitution of the United States which provides in pertinent part:

> Each house shall be the judge of the elections, returns and qualifications of its own members[.]

---

**2.** If we accept the position of the two dissenters, then we must at a minimum declare unconstitutional the following statutes: SDCL 12–21–47, 12–21–48(1), 12–21–50 and perhaps a host of others. These enactments all reflect clear legislative intent to safeguard fair elections by empowering South Dakota courts to review mistakes in recount proceedings.

The injunction was granted and the issue was appealed to the United States Supreme Court which held:

> Indiana has found, along with many other States, that one procedure necessary to guard against irregularity and error in the tabulation of votes is the availability of a recount.... A recount is an integral part of the Indiana electoral process and is within the ambit of the broad powers delegated to the States by Art. I, § 4.

> It is true that a State's verification of the accuracy of election results pursuant to its Art. I, § 4, powers is not totally separable from the Senate's power to judge elections and returns. But a recount can be said to "usurp" the Senate's function only if it frustrates the Senate's ability to make an independent final judgment. A recount does not prevent the Senate from independently evaluating the election any more than the initial count does. The Senate is free to accept or reject the apparent winner in either count, and, if it chooses, to conduct its own recount.

> \* \* \*

> For the reasons expressed, we conclude that Art. I, § 5, of the Constitution, does not prohibit Indiana from conducting a recount of the 1970 election ballots for United States Senator.

*Roudebush*, 405 U.S. at 25–26, 92 S.Ct. at 810–11, 31 L.Ed.2d at 11–12.

[¶ 14] Closer to home, the North Dakota Supreme Court has also upheld the jurisdiction of its courts to act in disputed election cases notwithstanding a constitutional provision identical to South Dakota Constitution Article III, § 9. In *State ex rel. Olson v. Bakken*, 329 N.W.2d 575 (N.D.1983), 526 ballots in an election precinct were not counted because of the erroneous labeling of some of the voting machines in the precinct. The rejection of these ballots threw open a race for the state house of representatives where the purported winner's margin of victory was less than 526 votes. Pursuant to state statutes, voters brought a court action contesting the election. A district court ordered that a special election be held, limited to those voters whose ballots had not been counted. The district court's order was appealed to the

North Dakota Supreme Court. The governor also moved that Court to issue an order declaring the district court's judgment *void ab initio*. Both the appeal and the governor's motion were based on a constitutional provision making each house of the legislature the judge of the election returns and qualifications of its members. In both the appeal and the motion hearing it was argued that this constitutional provision denied the district court jurisdiction to issue the order for a special election. The North Dakota court held:

> If we were to accept and extend the argument of the contestees and give Art. IV, § 26 [identical to S.D. Const. art. III, § 9], an overriding effect, without giving meaningful consideration to Art. VI, § 8 [i.e., the jurisdiction of district courts], and NDCC Ch. 16.1–16 [i.e., election contest proceedings in district court], an undesirable and absurd result would be reached. Every primary and general election involves some legislative candidates. Every challenge of such election per se, as distinguished from a challenge specifically directed to a legislative candidate, will incidentally involve a legislative candidate and, as a result, the house involved would be called upon to resolve the conflict. We know that the legislature is not in session, generally, when the primary or the general elections are held. Consequently, considerable confusion and delay would result. We do not believe the framers of the Constitution remotely had such an intent.

> In addition, we must also recognize that the Legislature is not in a position to provide any affirmative equitable remedy. The Legislature could reject the "election" of a legislator which may put into operation certain provisions of the Constitution and statutes resulting in the Governor calling a special election. But other affirmative equitable remedies would not be available.

> Significantly, the action commenced by the twelve voters did not contest the election of any legislative candidate specifically (NDCC §§ 16.1–16–10, et seq.). The challenge was to the election process in which 526 votes were not counted. The contest

only incidentally involved legislative candidates.

In resolving this issue, we cannot overlook that it involves a basic constitutional question, the right to vote and its importance. Taking into account the foregoing legal principles announced in the cases mentioned earlier, and giving full application to the constitutional and statutory procedures, we conclude that the district court has jurisdiction over the subject matter brought to it by the twelve voters contesting the election. However, under the provisions of Art. IV, § 26, of the North Dakota Constitution, each house will be the *final* judge on the election of its members.

*Olson,* 329 N.W.2d at 578–79 (citations omitted)(emphasis original).

[¶ 15] The foregoing authorities demonstrate that a constitutional provision that, "[e]ach house shall be the judge of the election returns and qualifications of its own members," does not consist of sixteen simple, unambiguous words as defendants have asserted. S.D. Const. art. III, § 9. Quite to the contrary, the courts in these cases have struggled to find the precise meaning and implication of such language. While this Court has not been explicit in its own view of the effect South Dakota Constitution Article III, § 9 has on its jurisdiction to act in legislative election disputes, its views are certainly implicit in at least two prior decisions.[3]

[¶ 16] In *State ex rel. Ingles v. Circuit Court of Spink County,* 63 S.D. 313, 258 N.W. 278 (1934), Ingles and Motley were candidates for the state house of representatives and received an equal number of votes. Ingles served notice of an election contest and began taking depositions from the clerk and auditor including the opening and examination of the ballot boxes. Motley procured a writ of prohibition from the circuit court directing Ingles to cease the depositions and

the opening of the ballot boxes. Ingles then applied to this Court for a writ of prohibition directing the circuit court to cease its interference with the depositions.

[¶ 17] Ingles asserted that all questions connected with a contest or attempted contest for legislative office are to be determined exclusively by the legislature and, for that reason, the circuit court exceeded its jurisdiction by interfering with the depositions. Thus, the issue of the jurisdiction of the courts to become involved in disputes over state legislative office was placed squarely before this Court and a full opportunity was presented for this Court to hold the judiciary has no jurisdiction to become embroiled in these disputes. However, this Court held:

> Section 9 of article 3 of the Constitution of this state reads in part as follows: "Each house shall be the judge of the election returns and qualifications of its own members." The power of each house of the Legislature to determine the election and qualification of its own members is therefore plenary. When the Twenty–Fourth Legislature shall assemble at the capitol on January 8 next, any person whomsoever may appear before either house and assert his right and title to any seat therein. It may be admitted, so far as the present issues are concerned, that, if such a claim is so asserted, then whether or not the house will listen at all to the claimant, what proof it will require of him, what investigation it will make of his claim, and what decision it will finally come to concerning such claim, are matters entirely and exclusively for that house to determine. If such a claim is presented, and the house sees fit to investigate the matter, no one can doubt the power of the house to summon and interrogate witnesses, to order ballots and ballot boxes relating to the election to the contested

---

3. Reliance has also been placed upon this Court's decision in *State ex rel. Walter v. Gutzler,* 249 N.W.2d 271 (S.D.1977), that, once the general election has been held, the power to pass upon the qualifications of a candidate for state representative is vested exclusively in the house of representatives under South Dakota Constitution Article III, § 9. *Gutzler,* however, is not instructive in our present inquiry. *Gutzler* was con-

cerned with reviewing qualifications for legislative office *not* the results of an election recount. Moreover, the proceedings in *Gutzler* were brought under the auspices of an election contest pursuant to SDCL 12–22–7. As conceded in *note 7, infra,* this Court has no jurisdiction over legislative election contests. Here, however, we are concerned with the review of an election recount not a legislative election contest.

seat brought in for examination, and to open and examine the same, or send a committee out for that purpose. That, however, is not the situation which is here before us. At the present time, the relator, Ingles, as an individual, is endeavoring to assemble some information, presumably for the purpose of presenting it to the House of Representatives in support of a claim which he expects hereafter to make before said house with reference to a seat therein.

*Ingles,* 63 S.D. at 319, 258 N.W. at 281. This Court went on to uphold the circuit court's issuance of its writ of prohibition to Ingles on the basis that Ingles had not complied with all of the applicable procedures for commencement of his election contest.

[¶ 18] In *Thorsness v. Daschle,* 279 N.W.2d 166 (S.D.1979) [*Thorsness I* ], Leo Thorsness, Tom Daschle's defeated opponent for the United States House of Representatives, petitioned for a writ of certiorari from this Court to review the recount procedures employed by several recount boards. Daschle moved to dismiss and quash the writ on the basis that under United States Constitution Article I, § 5, the United States House of Representatives had the final and exclusive jurisdiction to determine the election of its members.[4] Once again rejecting the notion that the judiciary is foreclosed from involvement in election disputes by a constitutional provision granting to a legislative body the power to judge the elections, returns and qualifications of its members, this Court made the following pertinent observations:

The effect of granting Daschle's motion to dismiss would be to preclude a judicial review of a recount procedure, i.e., the manner of holding elections, in a political election in this state. We cannot agree with such a holding in light of the United States Constitution or the above-cited authorities....

Our state has an extensive election system, which includes a recount procedure containing sixty-one sections, namely, SDCL 12–21–1 through 12–21–61. The entire purpose of this recount procedure was intended by the legislature to act as a method of policing and superintending the state's election system so that a candidate is not taken advantage of or deprived of a fair election. Adoption of Daschle's view would totally defeat the legislature's scheme and abrogate the legislative mandate to this court to review the recount procedures of the state. If a defeated candidate has a question regarding the correctness of the ballot-counting procedure in his congressional race, his only recourse is the recount procedure. The final step for a candidate is an application for a writ of certiorari to this court. To deprive him of this is to deprive him of his statutory right and his standing to question the accuracy of the voting process....

[A]s long as a state court's post-election procedures do not impede an independent determination of the election results by the United States Congress, there is no reason why a state may not protect and enforce its procedures through post-election judicial review. We agree. The possibility that Congress may decide to make its own investigation and determination apart from the judgment of the state court and the fact that Congress has the final authority to make such determination do not constitute a bar to the enforcement of state procedures designed to insure the legal outcome of its elections.

Therefore, Daschle's motion to dismiss the Thorsness petitions and to quash the Janu-

---

4. Thus, contrary to defendants' assertions during the hearing on this matter, separation of powers was clearly in issue in *Thorsness I* albeit that the separation was between the state judiciary and the United States House of Representatives under United States Constitution Article I, § 5 rather than between the state judiciary and the state house of representatives under South Dakota Constitution Article III, § 9. In this vein it is notable that United States Constitution Article I, § 5 is virtually identical to South Dakota Constitution Article III, § 9 in providing in pertinent part that, "Each house [of Congress] shall be the judge of the elections, returns and qualifications of its own members[.]" If anything, we view the separation of powers issue between the state judiciary and United States Congress in *Thorsness I* as more acute than the separation of powers issue in the instant case which involves the state judiciary and the state legislature and, therefore, does not concern separate levels of government.

ary 5, 1979, writ of certiorari issued by this court is denied.

*Thorsness I,* 279 N.W.2d at 168–70.

[¶ 19] These authorities lead to the conclusion that the judiciary may exercise a limited jurisdictional role in legislative election disputes.[5] In *Thorsness I,* we defined that role as the power of judicial review of recount procedures. It is our charge to police and superintend the state's election system so that candidates are not taken advantage of or deprived of fair elections. We are required to enforce state procedures designed to insure the legal outcome of elections. It is for these purposes that the legislature has specifically empowered this Court to review recount procedures of judicially appointed recount boards. SDCL 12–21–47, 12–21–48, 12–21–2. As the Supreme Court amplified in *Roudebush, supra,* a recount is an integral part of the electoral process. It is necessary to guard against irregularities and errors in the tabulation of votes and verifies the accuracy of election results.[6]

[¶ 20] It is only logical that such responsibilities be imposed upon the judiciary. *See Olson, supra.* The legislature is not normally in session when the general election is held. Consequently, considerable confusion and delay would result if the above superintending responsibilities were borne exclusively by the legislature.[7]

[¶ 21] This is not to overstate the jurisdiction of this Court in reviewing recounts. The

5. As to such a conclusion, much has been made of the failure of constitutional amendments in 1974 and 1976 that would have explicitly permitted the legislature to vest in the judiciary the power to determine contested elections. *See* 1974 S.D. Sess. L. ch. 1, § 7; 1975 S.D. Sess. L. ch. 2, § 7. *See also* S.D. Const. art. III, Historical Notes. Defendants argue the failure of these amendments clearly reflects the will of the people that the judiciary not involve itself in legislative election disputes. We find it difficult, however, to draw any conclusion as to the will of the people from the failure of these constitutional amendments. The amendments regarding determination of contested legislative elections were merely one part of one section of some seventeen separate sections that would have substantially rewritten all of Article III of the South Dakota Constitution dealing with the Legislative Department. Accordingly, it is impossible to ascertain the intent of the people concerning the precise sections of the proposed amendments that the people rejected. Moreover, to the extent the proposed amendments demonstrate a belief the judiciary does not currently hold the power to determine contested legislative elections, we do not disagree. As the balance of our decision on the jurisdictional issue demonstrates, the final power of determination clearly lies with the applicable house of the legislature and we do not presume to invade it.

6. The inconsistent tabulating procedures at issue in # 19899, *Kazmerzak v. Fryslie,* discussed at ¶ 55 *et seq.* herein, aptly demonstrates the importance of this function.

7. In that vein, we note a dearth of affirmative equitable remedies available from the legislature for irregularities in the election process. Even the legislative contest procedure outlined in SDCL 12–22–26 and 12–22–27 is vague and shrouded in some obscurity. Plaintiffs erroneously attempted to invoke the jurisdiction of this Court to hear the legislative "contest" filed with regard to these races pursuant to SDCL ch 12–22. However, this would have clearly exceeded the jurisdiction of this Court as a "contest" relates to a determination of the election. SDCL 12–22–1. As outlined above, this Court has no power under the constitution to make any final determination of the election as regards who will be seated. That power remains with the legislature under South Dakota Constitution Article III, § 9. A recount, however, is addressed only to the correct determination of the true and actual count of the ballots cast. SDCL 12–21–1. Duties in connection with a recount, therefore, are more in the nature of a ministerial or administrative function than a judicial or determinative function, particularly where the legislature retains the final power of determination. *See Roudebush, supra* (court duties in connection with a recount may be characterized as ministerial or administrative); *Healey v. Rank,* 82 S.D. 54, 140 N.W.2d 850 (1966)(duties of a recount board are ministerial in nature and it has no judicial or quasi-judicial functions). Thus, plaintiffs clearly erred in attempting to bring their contest proceedings before this Court and it was for that reason that this Court's writs of certiorari were explicitly limited to a review of the recount proceedings pursuant to SDCL ch 12–21. The provisions of SDCL ch 12–22 are not in conflict with this determination. Unlike certain other election contests, legislative election contests must be instituted pursuant to SDCL 12–22–26. SDCL 12–22–2. There is nothing in SDCL 12–22–26 which would indicate that a contest instituted under that provision is a court proceeding. In fact, SDCL 12–22–27 which deals with depositions in legislative election contests requires the depositions to be filed with the Secretary of State rather than the clerk of any court. This is strongly indicative that the election contest procedures outlined by SDCL 12–22–26 and 12–22–27 relate to contest proceedings *before the legislature* and not any court.

limits of our authority in this endeavor were clearly outlined in *Ingles, supra*. When the legislature assembles at the Capitol in January, any person may appear before either house and assert his rights and title to any seat therein in accord with the procedures prescribed by the legislature. If such a claim is asserted, whether or not the house will listen to it, what proof it will require, what investigation it will make and what decision it will finally come to concerning the claim are matters entirely and exclusively for that house to determine. If such a claim is presented, and the house sees fit to investigate it, no one can doubt the power of that house to summon and interrogate witnesses, to order ballots and ballot boxes relating to the election to the contested seat brought in for examination and to open and examine the same or send a committee out for that purpose.

■ [¶ 22] As the Supreme Court mentioned in *Roudebush, supra*, the judiciary usurps the above functions only if it frustrates the house's ability to make an independent final judgment. Recounts and review of recounts, however, do not prevent each house from independently evaluating the election any more than the initial count does. Each house is free to accept or reject the apparent winner in either count, and, if it chooses, to conduct its own recount. In *Thorsness I*, we made clear this Court's lack of any jurisdiction to dictate the final determination of a legislative election.[8] Our review of a recount and judgment in such a proceeding merely constitutes evidence. It remains with each house to perform its constitutional duty of determining who shall sit and this court can express no opinion on the outcome of that deliberation.

8. In *Warne v. Noonan*, 76 S.D. 426, 80 N.W.2d 74 (1956), this Court reviewed the action of two county recount boards in a state legislative race. To the extent that *Warne* can be construed as authorizing the judiciary to direct the issuance of a certificate of election, it is hereby overruled.

9. During oral argument, counsel for the defendants raised the specter of a "constitutional crisis" if we engage in such a review. We reject this notion for the reason our decision makes clear the legislature's determination of this matter is final. In conducting our review, we merely

[¶ 23] For the foregoing reasons, we deny defendants' motions to quash and proceed with our review of the purported irregularities and errors in the tabulation of votes presented by plaintiffs.[9]

## STANDARD OF REVIEW

■ [¶ 24] In certiorari proceedings to review election recounts:

the court may review completely all of the proceedings had relative to such recount as shown by such certifications, and correct any errors made in the determination of questions as to validity of ballots, and in computation of returns, and any errors which may be manifest from such certification.

SDCL 12–21–57. Accordingly, this Court's scope of review is *de novo, Duffy v. Mortenson*, 497 N.W.2d 437, 438 (S.D.1993), since review of a ballot involves construing a document, a question of law which does not require the Court to weigh evidence. *Thorsness v. Daschle*, 285 N.W.2d 590, 592 (S.D. 1979) [*Thorsness II* ].

[¶ 25] Following review, "[t]he judgment rendered by the court shall be such as the court deems required by the law as applied to the facts disclosed by the record presented, and shall pronounce what the court deems the correct result of the election involved as shown by the record." SDCL 12–21–59.

### # 19898    McIntyre v. Wick

[¶ 26] **A. Whether Exhibit 37 complied with the absentee ballot requirements.**

[¶ 27] In *In Matter of Election Contest as to New Effington*, 462 N.W.2d 185, 190 (S.D. 1990), we said:

carry out the superintending function the legislature itself mandated in its enactment of SDCL 12–21–47 and 12–21–48. If the legislature is displeased with our involvement, it may certainly repeal these provisions and avoid any "constitutional crisis" it perceives to exist. Our decision herein however, is intended to harmonize and give effect to *all* current statutory and constitutional provisions as is required by the rules of construction and interpretation. *See Volk, supra*. No construction offered by defendants accomplishes this task.

In *Larson* [*Larson v. Locken,* 262 N.W.2d 752, 755 (S.D.1978) ], this court noted that the purpose of absentee voting statutes is to allow voters who are unable to attend the polling place on election day the opportunity to vote, to prevent fraud, and to achieve a reasonably prompt determination of the result of the election. Further, we held that it was not the policy of the law to disfranchise [sic] voters because of an election official's mistakes, negligence, or misconduct.

Absentee ballot voting laws are considered mandatory.

> As a general rule, the statutory directions to the voter with respect to the time and manner of making applications for an absentee ballot, the manner of marking the same, the taking of the prescribed affidavit, and the return of the ballot, together with the affidavit, are regarded as mandatory and strict compliance therewith is required.

*Id.,* 262 N.W.2d at 755 (citing 26 AmJur2d, *Elections* § 245 (1966))(citing *Brown,* [*Brown v. Dakota Public Service Co.,* 68 S.D. 169, 299 N.W. 569 (1941) ] ).

The South Dakota Legislature has specifically spoken on this issue. It has provided through SDCL 12–19–34 that it is inappropriate for informalities to invalidate an election. SDCL 12–19–34 provides:

> No mere informality in the matter of carrying out or executing the provisions of this chapter shall invalidate the election or authorize the rejection of the returns thereof, and the provisions of this chapter shall be liberally construed for the purposes herein expressed or intended.

> Although absentee ballot voting laws are considered mandatory, the violations here do not mandate that this election be set aside. Here, the absentee voters substantially complied with the absentee voting requirements, albeit informally.

[¶ 28] The procedures for procuring, voting and tabulating an absentee ballot are governed by statute. SDCL 12–19–2 sets forth the requirements for application for an absentee ballot and provides, in pertinent part,

[a]n absentee voter desiring to vote by mail may apply to the person in charge of the election for an absentee ballot. The application or request shall be made in writing and signed by the applicant and state his voting precinct, place of voting residence and reason for which the ballot is requested.

After receiving the absentee ballot and marking the ballot, "[t]he voter shall place the voted ballots in the return envelope provided and seal the envelope. The voter shall sign the statement on the return envelope." SDCL 12–19–7. Prior to returning the absentee ballot to the person in charge of the election, the voter must sign the self-executing affidavit on the return envelope which states

I, ___[voter]___, under penalty of impersonating a registered voter (5 years imprisonment and $5,000 fine), state that I am a registered voter in the precinct, county, and state named on the front of this envelope, and that I voted the enclosed ballot. _____[Signature of Voter]_____

ARSD 5:02:10:05. These statutory and administrative provisions require the voter to sign twice, once in making application for the absentee ballot and again after casting the ballot.

[¶ 29] Upon receipt of an absentee ballot, the person in charge of the election must record the voter's name in the election pollbook after confirmation that "[t]he written application and statement were both signed by the voter." SDCL 12–19–10. When tabulating absentee ballots, the election board

shall carefully compare the statement on the reverse side of the official return envelope with the written application received from the officer in charge of the election without opening or breaking the seal of the return envelope. If the board is satisfied that the ballots received were voted by the voter whose name appears on the statement and that he is registered in such precinct and has not previously voted in that precinct at the election, they shall enter the voter's name on the election pollbook and, after opening the envelope without opening, unfolding or examining the ballots the envelope may contain, affix to

the ballots the official stamp and deposit the ballots in the proper ballot box and count the ballots in the manner prescribed by the state board of elections.

SDCL 12–19–47.

[¶ 30] Exhibit 37 is an official return envelope. The statement of absentee voter printed on the back of the envelope contains the purported signature of the voter. Stapled to the front of the envelope is the application for absentee ballot purportedly signed by the voter. Under SDCL 12–19–47, the election board did not open the envelope or count the ballot due to its determination that the required signature was not the same. The recount board, however, opened the envelope and counted the ballot over the dissent of one member of the three member board who believed that the signature on the ballot envelope was not necessarily the voter's and objected to counting the ballot. A copy of this ballot was placed in the envelope which was then taped shut. The original ballot was stamped with the official ballot stamp and mixed in with the other precinct ballots.

[¶ 31] McIntyre alleges an irregularity between the signatures on the absentee ballot application and the absentee voter statement on Exhibit 37. After physical examination of the signatures, we conclude the signatures are not identical. This difference, however, may simply be a result of the voter writing her signature on the absentee ballot application and printing her name on the absentee voter statement. Additionally, the record is void of any evidence the signature on the absentee voter statement was false or fraudulently executed. Absent such evidence we cannot find, as a matter of law, that both signatures are not those of the same voter; therefore, we are required to conclude that

the voter substantially complied with the absentee voter laws. Exhibit 37 is a legal ballot for Wick.[10] This determination does not result in a net gain or loss for either candidate, as the ballot was counted as a vote for Wick in the recount total.

[¶ 32] **B. Whether Exhibits 32 and 33 were invalid due to extraneous marks.**

[¶ 33] It is the duty of the courts and election judges to " 'determine and carry out the intent of the elector when satisfied that the elector has endeavored to express such intent in the manner prescribed by law or by directions found upon the ballot....' " *Stellner v. Woods,* 355 N.W.2d 1, 2 (S.D.1984)(quoting *Ward v. Fletcher,* 36 S.D. 98, 103, 153 N.W. 962, 964 (1915)).

[¶ 34] SDCL 12–20–7 provides:

Any ballot or part of a ballot from which it is impossible to determine the voter's choice shall be void and shall not be counted. When the marks complying with §§ 12–18–16 to 12–18–21, inclusive, on a ballot are sufficiently plain to gather therefrom a part of the voter's intention and there are no marks placed on the ballot contrary to § 12–18–22 it shall be the duty of the judges of election to count such part.

[¶ 35] ARSD 5:02:16:16 further provides that "[i]t shall be the duty of the judges to use their best efforts to determine the voter's intent in marking the ballot. This section shall be construed liberally by the judges to assure that each person's vote is counted."

[¶ 36] Applying these statutory and administrative rules to give effect to the intent of the voter, we conclude that Exhibits 32 and 33 are invalid because we are unable to determine the voters' intent based on the extraneous marks[11] placed on the ballots.

---

10. Exhibit 37 was also properly counted as a vote for Judy Rost.

11. SDCL 12–18–22 provides that "[n]o voter shall place any mark upon his ballot by which it may afterwards be identified as the one voted by him."

ARSD 5:02:16:17 further provides:

No mark shall be construed as an identifying mark if in the opinion of the judges it could have appeared on the ballot in the normal course of voting through inadvertence or ina-

bility to make a precise cross or check on the ballot.

Any other mark which appears to have been deliberately placed on the ballot by the voter and which could easily identify the ballot is an identifying mark, and any ballot which in the opinion of the judges contains such a mark shall not be counted.

Unless the ballot has been marked with a mark so as to enable a third person to determine that the ballot was marked by a particular voter, the mark is not an identifying mark. *See Church v.*

[¶ 37] Exhibit 32 indicates darkened ovals in front of the names of candidates McIntyre, Wick and Rost. A line was placed through the oval in front of McIntyre's name. It is impossible to determine from the additional line whether it was intended to select, change or obliterate a choice. Therefore, we find it impossible to determine the voter's intent and the ballot must be invalidated. This determination results in a net loss of one vote for Wick.

[¶ 38] Similarly, Exhibit 33 also contains an extraneous mark which prevents a determination of the voter's intent. The ovals in front of both the Democratic Party and the Republican Party straight tickets were darkened. The oval in front of the Republican Party has two lines through it. After review of the ballot, we find it impossible to determine which, if either, of the party votes the voter intended to cast and the ballot must be invalidated. This determination does not result in a net gain or loss for either candidate, as the ballot was not counted in the recount total.

[¶ 39] **C. Whether Exhibit 4, evidencing an erasure, is a legal ballot.**

[¶ 40] Exhibit 4 evidences an erasure by the voter. The ballot indicates a mark in the oval before McIntyre and Democrat Dick Casey. Additionally, the oval before Wick was marked and partially erased.[12]

[¶ 41] The matter of erasures has been the subject of a variety of law in South Dakota. First, in *Woodruff v. Heltibridle*, 37 S.D. 35, 156 N.W. 579, 580 (1916), this Court held that erasures constituted an identifying mark which invalidated a ballot. The next discussion of erasures occurred in the adoption of the administrative rules concerning elections. ARSD 5:02:16:17, as adopted in 1977, specifically provided that erasures were not identifying marks which would serve to invalidate a ballot.[13] Then, in 1979, we were called upon to consider the apparent contradiction between our holding in *Woodruff* and the newly-adopted administrative rules of ARSD title 5. *Thorsness II*, 285 N.W.2d at 591. In *Thorsness II*, however, it was unnecessary to specifically address the apparent contradiction of authority on erasures because the subject of that dispute concerned the validity of the administrative rules governing elections as a whole, not the specific provisions of ARSD 5:02:16:17. *Id.* Following our decision in *Thorsness II*, the administrative rules were amended to remove the specific examples of what was considered to be a non-identifying mark.[14] Determining the validity of Exhibit 4 in the instant case requires us to address the apparent contradictions in the authority concerning erasures at this time.

[¶ 42] The overriding consideration in determining the validity of a ballot is the ability to determine the voter's intent. *Stellner*, 355 N.W.2d at 2–3; SDCL 12–20–7. It

*Walker,* 10 S.D. 450, 452, 74 N.W. 198, 199 (1898)(stating "[i]t would be difficult to lay down any rule that would permit the voter himself from identifying his own ballot, and any attempt to do so would be futile.")

12. Physical examination of the ballot indicates the voter attempted to erase the mark in the oval in front of Wick's name. The attempted erasure is evidenced by physical markings consistent with the metal edge of a standard pencil eraser.

13. At the time of adoption, ARSD 5:02:16:17 provided, in pertinent part:

No mark shall be construed as an identifying mark when in the opinion of the judges it could have appeared on the ballot in the normal course of voting through inadvertence or inability to make a precise cross or check mark on the ballot. The following are identifying marks and shall not be counted:
Any name written on the ballot.

Unless otherwise provided, any letter of the alphabet.
Unless otherwise provided, any numeral.
The following are not identifying marks and shall be counted:
Tears, smudges, erasures, coffee stains, different colors of ink or pencil, voting for two candidates for one office, holes in the ballot.

14. ARSD 5:02:16:17 currently provides:

No mark shall be construed as an identifying mark if in the opinion of the judges it could have appeared on the ballot in the normal course of voting through inadvertence or inability to make a precise cross or check on the ballot.
Any mark which appears to have been deliberately placed on the ballot by the voter and which could easily identify the ballot is an identifying mark, and any ballot which in the opinion of the judges contains such a mark shall not be counted.

is not the policy of South Dakota to disenfranchise its citizens of their right to vote. *Duffy*, 497 N.W.2d at 439. "It has long been the rule in this state that it is the duty of courts and election judges to 'determine and carry out the intent of the elector when satisfied that the elector has endeavored to express such intent in the manner prescribed by law or by directions found upon the ballot[.]'" *Stellner*, 355 N.W.2d at 2 (quoting *Ward v. Fletcher*, 36 S.D. 98, 153 N.W. 962, 964 (1915)). In this vein, every effort must be made to determine the voter's true and actual intent in marking his ballot. *Id. See also* SDCL 12–21–1.

[¶ 43] An erasure is an extraneous mark on a ballot intentionally made by the voter. Unlike other deliberate marks which may create a question as to the intent of the voter, an erasure indicates the voter's intention to remove the original mark, even though the erasure is incomplete. We therefore conclude that an erasure, when clearly discernible but incomplete, is not an identifying mark which invalidates a ballot if it is possible to determine the voter's intent.[15]

[¶ 44] Here the erasure is clearly discernible but is incomplete. An examination of the ballot leaves no question as to the intent of the voter to remove the mark in front of Wick's name. Exhibit 4 counts as a vote for McIntyre.[16] This determination does not result in a net gain or loss for either candidate, as the ballot was counted as a vote for McIntyre in the recount total.

[¶ 45] **D. Whether Exhibit 22 constitutes a party ticket vote.**

[¶ 46] Before a ballot may be counted, the voter's choice must be sufficiently plain from the markings intentionally made by the voter. SDCL 12–20–7. The manner in which a voter may delegate his vote is prescribed by statute and administrative rule and includes the option to select candidates based entirely on their political party affiliation. SDCL 12–18–18. Optical scan ballots, such as those used in Legislative District 12, require the voter to completely blacken the oval in front of the choice. ARSD 5:02:06:01.02. Ballots marked in accordance with this requirement and absent any identifying marks are to be counted as legal ballots. SDCL 12–20–7.

[¶ 47] Exhibit 22 indicates a small mark in the oval in front of the Republican Party straight ticket. Wick argues that this mark constitutes a straight party vote for the Republican Party and therefore a vote for Wick. We disagree.

[¶ 48] A voter's intent is determined by the marks on the ballot. *Vallier v. Brakke*, 7 S.D. 343, 354, 64 N.W. 180, 183 (1895). Neither election officials nor the court may go beyond the voter's actual marks to determine the voter's intent. *Id.* Our examination of Exhibit 22 indicates that the mark appearing in the oval in front of the Republican Party straight ticket does not comply with the directions appearing on the ballot to completely blacken the oval next to the candidate or party for which the voter wishes to vote. Nor is the mark consistent with the other marks placed on the ballot by the voter. Unlike the small mark present in the oval in front of the Republican Party column, the voter completely darkened the oval in front of other candidate's names in which individual votes were cast, as well as the constitutional amendments and initiated measure included on the ballot. Furthermore, the voter also darkened ovals in front of the only Republican candidate for presidential electors and the only Republican candidate for the Public Utilities Commission. These marks are contrary to an intention to vote a straight party ticket. The voter's choice not to vote for candidates in the local legislative and county offices does not imply a choice to vote a straight party ticket in those races. Rather, it is just as likely the mark appearing in front of the Republican Party straight ticket is the result of hesitation or inadvertence by the voter. *See Church*, 10 S.D. at 451, 74 N.W. at 199

---

**15.** We are cognizant of the amendment to ARSD 5:02:16:17 which removed erasures from the list of markings specifically noted as not being identifying marks. ARSD 5:02:16:17. However, we note the amended administrative rule does not now specifically list erasures as an identifying mark but rather is silent on the issue.

**16.** Exhibit 4 also properly counts as a vote for Casey.

(holding marks inadvertently made by a voter do not invalidate the ballot). Exhibit 22 is a valid ballot. This determination does not result in a net gain or loss for either candidate, as the ballot does not cast a vote for either candidate.

[¶ 49] The effect of our review of these ballots is to give Wick a net loss of one vote. Accordingly, both candidates have received 4,191 votes.[17]

#### #19899   Kazmerzak v. Fryslie

[¶ 50] Kazmerzak challenges the inconsistent methods by which ballots with a straight party vote and a mark in front of only one of the legislative candidates in that party were counted in Legislative District 6 and asks this Court to determine the correct method for counting such ballots. Such a determination requires the statutory interpretation of SDCL 12–18–18 and SDCL 12–20–8.

[¶ 51] Statutory interpretation is a question of law, and accordingly, our review is *de novo*. *In re Estate of Gossman,* 1996 SD 124, ¶ 6, 555 N.W.2d 102 (citing *Sioux Valley Hosp. Ass'n v. State,* 519 N.W.2d 334, 335 (S.D.1994); *King v. John Hancock Mut. Life Ins. Co.,* 500 N.W.2d 619, 621 (S.D.1993)). "We interpret statutes in accord with legislative intent." *Fall River County v. South Dakota Dep't of Revenue,* 1996 SD 106, ¶ 13, 552 N.W.2d 620, 624. Legislative intent is "derived from the plain, ordinary and popular meaning of statutory language," *Whalen v. Whalen,* 490 N.W.2d 276, 280 (S.D.1992), and this Court "must assume that the legislature meant what the statute says and therefore give its words and phrases a plain meaning and effect." *Nilson v. Clay County,* 534 N.W.2d 598, 601 (S.D.1995)(quoting *Caldwell v. John Morrell & Co.,* 489 N.W.2d 353, 364 (S.D.1992)).

[¶ 52] With these rules in mind, we proceed to an examination of the statutes governing casting and tabulating ballots involving a straight party vote. A voter may cast a straight party vote by "mark[ing] his ballot in the circle at the top of a party column." SDCL 12–18–18. A voter may also vote a crossover ballot, whereby the voter marks the circle at the top of the party column and also marks the square preceding the name(s) of one or more candidates printed under another party column so as to vote a straight party ticket as to all races except those specifically marked by the voter. *Id.;* SDCL 12–18–20. *See also* ARSD 5:02:16:24.

[¶ 53] The procedures for tabulating straight party votes and crossover votes are set forth in SDCL 12–20–8, which provides:

> The judges, in counting the votes, shall endeavor to record the intention of the voter. Should there be a mark on the ballot in the circle at the head of any column, the judges shall hold the intention of the voter to be to vote for all candidates in the column over which the mark is placed, unless there should be a mark in the square at the left of the name of some candidate in some other column on the ballot. The judges shall then hold the intention of the voter to be to vote for the candidate or candidates before whose name he has placed a mark, and for all candidates in the column over which he has placed a mark, except for the candidate or candidates where a mark has been placed in some other column; except, also, that where there is more than one candidate in the same column for the same office and the voter has placed a mark in the square at the left of the name of a candidate for that office in some other column other than the one over which he has placed a mark, the judges shall hold the intention of the voter to be to vote only for the candidate or candidates for that office before whose name he has placed a mark.

*See also* ARSD 5:02:16:24 (giving example of a crossover ballot and setting forth the method by which it should be tabulated).

[¶ 54] SDCL 12–18–18 further instructs as to the procedure for tabulating crossover ballots and provides, in pertinent part,

> [a crossover ballot] shall be counted as cast for all the candidate or presidential electors named under the party column which has been so marked, except as to the office or offices of a candidate or candi-

---

17. In elections not controlled by Article III, § 9, SDCL 12–21–43 would break a tie vote by draw-ing lots. *Duffy v. Mortenson,* 497 N.W.2d 437, 440 (S.D.1993).

dates or presidential electors marked in another column. A mark in another column shall be counted as cast for the candidate or candidates or presidential electors beside whose name or names such mark may have been placed.

[¶ 55] The ballots in question do not evidence straight party or crossover voting, but rather an unsuccessful attempt at bullet voting [18] within the same party column as that marked at the top of the ballot. When tabulating these bullet votes, the counties in Legislative District 6 followed varying procedures. Codington and Miner counties counted the bullet vote as a vote only for the candidate specifically marked by the voter, essentially overriding the straight party vote for the legislative race. Hamlin, Clark, and Kingsbury counties counted the bullet vote as a vote for both candidates under the party column marked at the top of the ballot.

[¶ 56] SDCL 12–20–8 provides that a mark at the top of a party column constitutes a vote for all candidates of the party unless the voter marks the name of a candidate "in some other column on the ballot." After marking the top of a party column, only crossover votes in another column invoke the voter's ability to bullet vote in a particular race. SDCL 12–18–18; 12–20–8. Ballots marked at the top of the party column and marked in front of only one of the legislative candidates of that same party do not constitute a cross over to another column.

▆ [¶ 57] A plain reading of SDCL 12–20–8 reveals that, absent a mark in some other column, the voter's mark at the top of the party column supersedes any other marks in that party column. SDCL 12–20–8

specifically requires a ballot marked at the top of the party column be counted as a vote for all the candidates in that party unless the voter marks "in some other column on the ballot." Furthermore, the legislature has specifically provided a procedure for a voter to cast a crossover ballot in conjunction with a straight party vote. SDCL 12–18–18; SDCL 12–18–20. No such provision has been made for bullet voting within a straight party vote.

▆ [¶ 58] Therefore, we hold that under SDCL 12–20–8, both legislative candidates in the same party should be credited with a vote if the voter places a mark at the top of the party column and makes a mark in front of only one of that party's legislative candidates. The method used by Codington and Miner counties for counting the disputed ballots was in error.

[¶ 59] Accordingly, by interim order we directed the recount boards of Codington and Miner counties to recount the ballots consistent with this opinion and certify the corrected tally to this Court, to the South Dakota House of Representatives, and to any other official or agency as required by law forthwith but not later than January 9, 1997. Upon receipt of the certifications from Codington and Miner counties this Court shall enter judgment pursuant to SDCL 12–21–59.

[¶ 60] KONENKAMP and GILBERTSON, JJ., concur.

[¶ 61] SABERS and AMUNDSON, JJ., dissent.

18. A bullet vote is the result of a voter not voting for the maximum number of candidates allowed. For example, when a voter votes for only one candidate in a race in which the voter may vote for up to three candidates, the voter has cast a bullet vote. This strategy is most commonly used to elect minority candidates. *See Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The process of bullet voting has been described as follows:

Consider a town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that each white candidate receives about 300 votes and the black candidate receives 400 votes. The black [candidate] has probably won a seat. This technique is called single-shot [or bullet] voting. Single-shot voting enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among the candidates.

*City of Rome v. United States*, 446 U.S. 156, 184 n. 19, 100 S.Ct. 1548, 1565 n. 19, 64 L.Ed.2d 119, n. 19 (1980).

SABERS, Justice (dissenting).

**[¶ 62] 1. The constitution requires the Legislature to be the judge of the election returns of its members.**

[¶ 63] A plain review of Article III, § 9 of the South Dakota Constitution demonstrates it is not ambiguous: "Each house shall be the judge of the election returns and qualifications of its own members." The constitution vests in the Legislature the jurisdiction to decide this dispute. It is not appropriate for judicial review despite the purported legislative delegation of the duty to this court in SDCL 12–21–48(1). An objective reading of the cases relied on in the majority opinion does not provide, expressly or impliedly, authority for the South Dakota Supreme Court to review a recount and issue a non-binding, advisory opinion. At its essence, the dispute here is a nonjusticiable controversy—a political question—which is beyond our jurisdiction to consider in any form.

[¶ 64] The United States Supreme Court has unequivocally ruled that political questions are outside the jurisdiction of judicial decision makers. In *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663, 686 (1962), the Court explained what has become the definitive test for determining whether a justiciable controversy exists:

> We have said that "in determining whether a question falls within [the political question] category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." The nonjusticiablity of a political question is primarily a function of the separation of powers. Much confusion results from the capacity of the "political question" label to obscure the need for case-by-case inquiry. Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.

A political question is one

> of which courts will refuse to take cognizance, or to decide, on account of their purely political character, or because their determination would involve an encroachment upon the executive or legislative powers.

> "Political question doctrine" holds that certain issues should not be decided by courts because their resolution is committed to another branch of government and/or because those issues are not capable . . . of judicial resolution.

*Black's Law Dictionary* 1158–59 (6th ed.1990) (citation omitted).

[¶ 65] The Court explained this further in *Nixon v. United States*, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993). *Nixon* makes clear the two concepts cannot be considered separately; "the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Id.* at 228–29, 113 S.Ct. at 735, 122 L.Ed.2d at 9.

[¶ 66] It is apparent from the language of Article III, § 9 that this issue is textually committed. Initially, in examining the language, we note that the framers of the constitution used the word "shall" in granting to the Legislature the authority to judge its members' election returns. When "shall" is the operative verb in a statute, it is given "obligatory or mandatory" meaning. *See In re Groseth Int'l, Inc.*, 442 N.W.2d 229, 231–32 (S.D.1989) (citing *Person v. Peterson*, 296 N.W.2d 537 (S.D.1980); *Tubbs v. Linn*, 75 S.D. 566, 70 N.W.2d 372 (1955); 2A *Sutherland Stat. Const.* § 57.03 at 643–44 (4th ed.1984); Sutton, *Use of "Shall" in Statutes*, 4 J. Marshall LQ 204 (1938), *reprinted in* 1A *Sutherland Stat. Const.* 691 (4th ed.1985)). The actual text of this constitutional provision plainly demonstrates that the people conferred on the Legislature the authority to judge election returns of its members.

[¶ 67] Plaintiffs focus on the word "members" and assert that a "memberelect" becomes a "member" only after the individual

has been sworn in prior to the commencement of the legislative session in January. Therefore, they claim, this court may review a recount because its "action as it relates to votes for the member-elect are not superseded by the Legislature's rights relating to its members." The text of the constitution demonstrates that the fault with this assertion is two-fold: 1) Article III, § 8 clearly refers to "members-elect" as "members" when it provides that *"Members* of the Legislature ... *before* they enter upon their official duties [shall take an oath]" and a "member" refusing the oath forfeits office (emphasis added); and 2) the claim that any action this court takes will not be superseded by the Legislature is contradicted by Plaintiffs themselves when they argue this court will "[determine] who has won," yet the "Legislature [has] the authority to determine ... who should be seated."

[¶ 68] It is this second fallacy, coupled with the mandatory "shall," which makes this a nonjusticiable issue under *Baker* and *Nixon.* If this court issues this advisory and nonbinding opinion, it may be modified or ignored by the Legislature. "[T]he lack of finality ... counsel[s] against justiciability." *Nixon,* 506 U.S. at 236, 113 S.Ct. at 739, 122 L.Ed.2d at 13.

> [The Legislature] cannot require the judiciary as a co-ordinate department of government to hold a trial and render a decision which in its nature must be purely tentative or advisory and wholly subject to its own review, revision, retrial, or inaction. This would be imposing upon the judicial department of government the investigation of a matter not resulting in a judgment, not finally fixing the rights of parties, and not ultimately determining a state of facts. It would subject a proceeding arising in a court to modification, suspension, annulment or affirmation by a part of the legislative department of government before it would possess any definite force.

Manifestly this is in contravention of ... separation of the legislative and judicial departments of the government.

*Dinan v. Swig,* 223 Mass. 516, 112 N.E. 91, 94 (1916).

[¶ 69] The actual language of Article III, § 9 of our state's constitution mandates that election returns of the members are to be judged by the Legislature itself. Thus, because there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker* requires the conclusion that this is a nonjusticiable controversy.[19]

[¶ 70] **2. The constitution can not be changed by the Legislature or the judiciary; only the people have that power through a constitutional amendment.**

[¶ 71] The people of South Dakota established the constitution:

> The policy of the State of South Dakota is set by the people of South Dakota. This is principally done by the people through enactment of a constitution, ratification of amendments, and enactment of statutes through their legislative representatives.

*Cummings v. Mickelson,* 495 N.W.2d 493, 510 (S.D.1993) (Sabers, J., dissenting). It is clear from the constitution, and from the failure of two proposed amendments[20] to this constitutional provision which would have empowered the Legislature to vest in the judiciary the determination of contested legislative elections, that the people want the Legislature to be the judge of the election returns of its own members. The will of the citizens of this state in rejecting such a provision is unique evidence that under the constitution as originally framed, the Legislature— not this court—has the authority to determine the election returns. *See Poppen v. Walker,* 520 N.W.2d 238, 246 (S.D.1994).

[¶ 72] Plaintiffs insist the Legislature had the power to delegate its authority to judge

---

**19.** For this reason, there is no need to consider the separate hurdle of whether there is "a lack of judicially discoverable and manageable standards for resolving the issue." *Baker,* 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686. Even if we went on to consider this point, it is apparent that such standards are lacking here as evi-

denced by the difficulty encountered in the majority opinion to discern such standards.

**20.** With regard to the significance of the failure to amend the constitution to allow the judiciary to determine contested elections, I join Justice Amundson's dissent.

the outcome of the elections of its members and did delegate that authority to this court. They assert that since the Legislature has a constitutional obligation to provide for this court's appellate jurisdiction, it also has the authority to delegate to this court the constitutional obligation placed upon it to judge the election returns of its members. S.D.Const. Art. V, § 5. Plaintiffs' contention that this court has the jurisdiction to decide these issues ignores the significance of the constitutional enactment of the people.

[¶ 73] "It is the duty of the Supreme Court, not the legislature, to determine the meaning of constitutional terms. The legislature cannot define the scope of a constitutional provision by subsequent legislation." *Poppen,* 520 N.W.2d at 242 (stating that it is a function of the judiciary, not the legislature, to define the scope of constitutional provisions) (citing *South Dakota Auto. Club v. Volk,* 305 N.W.2d 693, 700 (S.D.1981); *Edge v. Brice,* 253 Iowa 710, 113 N.W.2d 755, 759 (1962)).

[¶ 74] Justice Morgan's dissent in *Thorsness v. Daschle,* 279 N.W.2d 166, 170–71 (S.D.1979), might have been written for this case:

> The majority opinion calls for an exercise in futility.
>
> How in the world can anyone argue that the questions "who won the election?" and "who will be seated?" are mutually exclusive. It is purely an appeal to the provincial and quixotic.
>
> . . . .
>
> Let us look at *Roudebush v. Hartke,* et al., 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), on which the majority so heavily

relies. The United States Supreme Court clearly states that the question "who is entitled to be seated?" is a nonjusticiable political question. The Court then goes on to uphold the right of a candidate to exercise his right to a recount before court-appointed recount commissioners which his opponent had sought to enjoin. It is, first of all, noteworthy that the decision pointed out in detail the distinction between judicial and nonjudicial functions of the courts. Under Indiana statute there was no provision for judicial review, merely for court appointment of the recount commissioners, which the decision denominated a nonjudicial function. So, while assuring the candidate his right to recount board review, the Court in fact reiterated its previous holding ... that *the outcome of the election, being a political question, was not a justiciable question* because of the separation of powers provided by the United States Constitution. Thorsness wants the five members of this court to reexamine for a second time the ballots that have been examined and reexamined. The principal contention as to almost every ballot is whether or not it bears an identifiable mark. These issues were presumably argued before the election boards and, beyond any question, were argued before the recount boards. Thorsness wants us to be the court of last guess. I have participated in enough election contests to know the futility [21] of trying to determine whether a ballot was fatally marked by the voter or inadvertently by an election clerk or judge, or perhaps now by recount board members. Lacking some divinely inspired perception, it can be no more than a guess,

---

21. The futility of such an exercise is present in this case also. See, for example, the repeated disregard of reasonably plain instructions by the absentee voter involved in Issue A, Exhibit 37. *Supra* ¶¶ 26–31. Compare the written and printed "signatures" and determine whether there was even substantial compliance with those instructions.

See also Issue B, Exhibits 32 and 33, ¶¶ 32–38, and compare with the analysis of Issue C, Exhibit 4, ¶¶ 39—44, and determine whether "every effort [was made] to determine the voter's true and actual intent in marking his ballot" as stated in ¶ 42 of the majority opinion. Likewise, are the same analysis and tests being applied to

determine the voter's intent and invalidity due to extraneous marks in both issues? In deference to the majority, these issues were not adequately addressed in Plaintiffs' briefs and were not addressed at all in Defendants' briefs. As stated by Justice Morgan: "What possible precedential value for future elections can be gleaned" from such an exercise in futility. *See Boesch v. City of Brookings,* 534 N.W.2d 848, 850 (S.D.1995) (we do not issue "opinion[s] merely for the purpose of establishing a precedent"). There was no trial, no evidentiary hearing, just a rush to judgment that, contrary to the majority's intention, could be harmful rather than helpful.

but it must be made under the guise of the *judicial* function of this court.

. . . .

What possible precedential value for future elections can be gleaned from a determination that Exhibit 4 from Swan Lake Township of Turner County or Exhibit 20 from Estelline Precinct of Hamlin County, or any of the other seventeen-hundred-plus exhibits, were in fact marked ballots or not? It is a fact question that will have to be determined exhibit by exhibit, case by case, so long as paper ballots are used.

In summation, I believe that the majority has embarked this court on a quest that will expend an extremely large amount of judicial time for no purpose, not unlike Don Quixote riding out to joust with windmills for the favor of the illusory Dulcinea.

(Emphasis in original; original footnotes omitted; footnote added). Likewise, the issue presented here—the determination of two contested legislative elections—does not present a justiciable controversy.[22] The constitution requires the Legislature—not this court—judge the outcome and only an amendment to the constitution would confer on us the authority to pass judgment in this matter.

[¶ 75] **3. If this court has no jurisdiction to issue a final, binding opinion, we should issue none at all.**

[¶ 76] The majority concedes that we do not have jurisdiction to render a real opinion, one that would be final and binding on the Legislature. In fact, this court has absolutely no authority to render an advisory opinion to the Legislature. Article V, § 5, provides in part: "The *Governor* has authority to require opinions of the Supreme Court upon important questions of law involved in the exercise of his executive power and upon solemn occasions." (Emphasis added). *See also In re Constr. of Art. III*, 464 N.W.2d 825, 826 (S.D.1991) ("The Governor's power to require an advisory opinion from the Supreme Court 'is confined exclusively to such questions as may raise a doubt in the executive department,—*never in the legislative.* Were we to construe it otherwise, it would be liable to become the medium of great abuse.'" (Citation omitted; emphasis added)). "In effect . . . we would be giving an advisory opinion to the . . . legislature, and such an opinion exceeds our authority." *Id.* at 827.

[¶ 77] In ¶ 22, the majority opinion states:

In *Thorsness I*, we made clear this Court's lack of any jurisdiction to dictate the final determination of a legislative election. Our review of a recount and judgment in such a proceeding *merely constitutes evidence.* It remains with the house to perform its constitutional duty of determining who shall sit and this court can express no opinion on the outcome of that deliberation.

(Emphasis added; footnote omitted.) It would be one thing if our "advisory opinion," which merely constitutes evidence, would be binding on the Legislature—but it has no binding effect. It would be another thing if this "evidence" had to be accepted or rejected by the Legislature based on standards of review similar to rules of appellate procedure. However, this "evidence" may be totally rejected by the Legislature in an absolutely arbitrary manner. In other words, our "advisory opinion" is nothing more than mere "evidence" which may be rejected out of hand. Nowhere in the Constitution does it say that the Supreme Court should provide evidence for the Legislature. In effect, our "advisory opinion" becomes a "nonopinion."

[¶ 78] Therefore, we are left to issue a nonbinding, advisory opinion—one that "merely constitutes evidence." Simple logic would dictate that if the Supreme Court of the

---

**22.** This case is much different than *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), where the Supreme Court found a justiciable controversy to exist over whether Powell, elected to serve in the United States House of Representatives, was unlawfully excluded from the House. It was undisputed that Powell had been duly elected and satisfied the qualifications to be seated in the 90th Congress. *See* U.S.Const.Art. 1, § 2. The Court found the controversy justiciable because its resolution turned solely on the meaning of the constitutional provisions and did not impose a political confrontation between the legislative and judicial branches of government.

State of South Dakota can not issue a binding, final opinion, it should issue none at all. *See Boesch v. City of Brookings,* 534 N.W.2d 848, 850 (S.D.1995) (we do not issue "opinion[s] merely for the purpose of establishing a precedent"). Accordingly, recount results should go directly to the parties, and to the Legislature for its consideration in judging the election returns as required by the constitution. S.D.Const.Art. III, § 9.

[¶ 79] I join Justice AMUNDSON'S dissent.

AMUNDSON, Justice (dissenting).

[¶ 80] I dissent.

[¶ 81] Proposed amendments to Article III, § 9, were put to the electorate on two separate occasions in 1974 and 1976. Twice the people of South Dakota voted to reject these amendments which "would have empowered the legislative house to vest in the judiciary the determination of contested legislative elections." S.D.Const.Art. III, § 9, Historical Note (1978); *see also* 1974 S.D.Sess.L. ch. 1, § 7; 1975 S.D.Sess.L. ch. 2, § 7. In other words, the people rejected the opportunity to vest in this Court the authority to determine who wins a seat in the Senate or House.[23] I submit the majority is now attempting to make such an amendment by judicial fiat.

[¶ 82] While the majority contends it is "impossible to ascertain the intent of the people concerning the precise sections of the proposed amendments that the people rejected[,]" the fact remains, and the majority admits, the people voted down the amendment on two different occasions. Whether there were a hundred sections or one section, there is no dispute that the entire amendment, including the section extending authority to this Court to determine contested elections, was twice rejected by the people.

[¶ 83] The majority disregards the will of the people of this state by overlooking the rejected amendments in 1974 and 1976. Previous decisions by this Court, however, emphasize the significance of the will of the people. *See, e.g., State v. Moeller,* 1996 SD 60, ¶ 103, 548 N.W.2d 465; *Cummings v. Mickelson,* 495 N.W.2d 493, 502 (S.D.1993); *Kneip v. Herseth,* 87 S.D. 642, 658–59, 214 N.W.2d 93, 102 (1974). Consistent with these opinions, we must accept the plain desire of the people that the authority to determine who shall be seated in either house is vested in those two bodies.

[¶ 84] Furthermore, the majority cites *Ingles,* 63 S.D. at 319, 258 N.W. at 281, for the proposition that this Court implicitly stated it had jurisdiction to resolve disputes similar to the one at hand. The majority opinion quotes certain language from *Ingles* to support this statement. However, a significant sentence is obviously overlooked or disregarded, wherein this Court stated: "The power of each house of the Legislature to determine the election and qualification of its own members is therefore *plenary.*" *Id.* (emphasis added). "Plenary" means absolute. Webster's New Collegiate Dictionary 882 (1974). Thus, we have held that the Legislature's authority to determine election disputes is *absolute,* and should remain as such today.[24]

[¶ 85] I further emphasize that the majority cites to no authority in the South Dakota Constitution which directs this Court to administer advisory opinions on such election disputes. *See, e.g., In re Constr. of Art. III,* 464 N.W.2d 825, 827 (S.D.1991) (stating the Court lacked authority to give an advisory opinion on reapportionment); *In re Advisory Opinion Concerning H.B. 1255,* 456 N.W.2d 546, 551 (S.D.1990) (stating the Court had no authority to render an opinion to the agriculture and business development finance authority). Moreover, as stated in *Associated General Contractors v. Schreiner,* we are to examine the Constitution in total. 492 N.W.2d 916, 923 (S.D.1992) ("in construing a constitutional provision, [the court] must have regard to the whole instrument, ...

---

**23.** The people's will is examined because, as we stated in *Poppen v. Walker,* "amendments to a constitutional provision proposed but rejected may be considered in determining the intent of the framers." 520 N.W.2d 238, 246 (S.D.1994).

**24.** The issue in this case is the jurisdiction of legislative elections under the Constitution. Chapters 12–21 and 12–22 apply to municipal and county elections as evidenced by the reported cases. Therefore, there is no issue in this case regarding the constitutionality of those statutes as they apply to these other elections.

seek to harmonize the various provisions, and if possible, give effect to all of them."). After one reads the entire Constitution, it is clear that any decision we render today is not binding on anyone and, therefore, cannot be enforced. Article III, § 9, of the South Dakota Constitution expressly grants to the Legislature the duty to determine contested elections of its members: "Each house shall be the judge of the election returns and qualifications of its own members." Without a provision in the Constitution that authorizes the delegation of this authority to a coordinate branch of government, we cannot override this clear statement of authority granted to the Legislature; any decision by this Court concerning the validity of the elections would be nonbinding. As stated in *Roudebush v. Hartke*, "[j]udicial interference with this 'indubitable power' was said to be possible only upon a clear showing of 'such arbitrary and improvident use of the power as will constitute a denial of due process of law.'" 405 U.S. 15, 32, 92 S.Ct. 804, 814, 31

L.Ed.2d 1, 15 (1972) (Douglas, J., dissenting in part) (quoting *Barry v. U.S. ex rel. Cunningham*, 279 U.S. 597, 620, 49 S.Ct. 452, 457, 73 L.Ed. 867, 874 (1929)).

[¶ 86] Similarly, "judicial interference" with the expressly delegated power of the Legislature to judge the election returns is unwarranted in this case because, at this time, we do not know if the final decision in this dispute is "arbitrary and improvident" since no action has been taken as of this date. Even if such a contention can be made after the Legislature acts, it does not come into play at this time.[25] Only after an individual has taken every step necessary to be seated in the appropriate house and been denied such a right would this Court be in a position to decide whether there had been a denial of due process of law based on the final decision made by the legislative body.

[¶ 87] Justice SABERS is authorized to state that I also join his dissent.

**25.** By way of example, the case of *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), demonstrates this ripeness element to the justiciability of such a controversy. In *Powell*, the United States Supreme Court held that Powell's petition was ripe for review where the United States House of Representatives had refused to seat Powell and adopted a resolution excluding him from membership, even though it was undisputed that he had been duly elected and satisfied the constitutional qualifications to hold office. Given this posture, the controversy was limited to a determination of the meaning the phrase "be the judge of the qualifications of its own members" of Article I, § 5 of the federal constitution. In this case, after the Legislature has made a final decision, the dispute would be ripe for determination of whether there were any constitutional deficiencies in that decision.

Exhibit 37

**APPLICATION FOR ABSENTEE BALLOT**

❶ _____Minnehaha_____ COUNTY, SOUTH DAKOTA

Check One:  ( ) Presidential Primary (party ballot as shown on voter registration)

( ) Primary (party ballot as shown on voter registration)

( X ) General

( ) Municipal

( ) School

( ) Special _____

(specify jurisdiction)

OCT 18 1996

❷ My current voter registration residence address and precinct is: _____

_____1017 Lincoln Rd : Sioux Falls, SD 57105_____

❸ Following is the reason for my ballot request:

(X) I expect to be absent from the county on election day    12  5-3

( ) I am totally and permanently disabled

( ) I am confined by illness or temporary physical disability

( ) I am prohibited from voting on election day by my religious beliefs

( ) I am a resident student at _____

( ) The nature and hours of my employment will prevent me from voting at the polls

CAROL HAHN    ( ) I am a member of the Armed Forces stationed at _____

I hereby certify that these statements made by me are true and correct. 1976

x❹ _____    _____    _____

Print name as it appears on registration list    Signature    Date

**RETURN ENVELOPE**

**STATEMENT OF ABSENTEE VOTER**

I, _CAROL A. HAHN_ _____ under penalty of impersonating a registered voter (5 years imprisonment and $5,000 fine), state that I am a registered voter in the precinct, county, and state named on the front of this envelope, and that I have voted the enclosed ballot.

_____

Signature of Voter

## Exhibit 32

| A MINNEHAHA COUNTY | B NOVEMBER 5, 1996 | C SOUTH DAKOTA |

### INSTRUCTIONS TO THE VOTER:

To vote for a candidate (or group of presidential electors) whose name is printed on this ballot, completely blacken the oval (⬛) next to the name. YOU MUST USE ONLY THE PENCIL PROVIDED TO MARK YOUR BALLOT!

### PARTY TICKET:

To vote a Party Ticket, blacken the Party Oval (⬛) completely. If you vote a Party Ticket and wish to vote for any candidate of another party or an independent candidate, completely blacken the oval (⬛) next to that candidate's name

⬭ LIBERTARIAN PARTY

⬭ DEMOCRATIC PARTY

⬭ REPUBLICAN PARTY

### PRESIDENTIAL ELECTORS

You may vote for ONE slate

⬭ **Browne & Jorgensen**
Electors                    LIB
Deborah Barton  Rapid City
Spencer Nesson  Huron
Mary Ann Winter, Huron

⬭ **Clinton & Gore**
Electors                    DEM
James Beddow  Sioux Falls
Jim Abbot  Yankton
JoAnn Conroy  Batesland

⬛ **Dole & Kemp**
Electors                    REP
William J. Janklow  Pierre
Joel Rosenthal  Canton
Carole Boos  Milbank

⬭ **Perot & Campbell**
Electors                    IND
affiliated with the Reform Party
Serena A. Hyatt, Summit
George M. Hyatt  Summit
Everette Philen  Rosholt

⬭ **Phillips & Knight**
Electors                    IND
affiliated with the U.S. Taxpayers Party
Fred D. Carpenter  Tyndall
William L. Scott  Sioux Falls
James E. Trimble  Watertown

⬭ **Hagelin & Tompkins**
Electors                    IND
affiliated with the Natural Law Party
James Balakier  Vermillion
Ann Stewart Balakier  Vermillion
Margaret E. Bhatara  Sioux Falls

### UNITED STATES SENATOR

You may vote for ONE

⬭ **Tim Johnson**          DEM
Vermillion

⬛ **Larry Pressler**       REP
Humboldt

### UNITED STATES REPRESENTATIVE

You may vote for ONE

⬭ **Rick Weiland**         DEM
Sioux Falls

⬛ **John R. Thune**        REP
Pierre

⬭ **Stacey L. Nelson**     IND
Milbank
affiliated with the Reform Party

⬭ **Kurt Evans**           IND
Wessington Springs
affiliated with no party

### PUBLIC UTILITIES COMMISSIONER

You may vote for ONE

⬭ **James Christen**       LIB
Huron

⬛ **Pam Nelson**          DEM
Sioux Falls

⬭ **Roy Letellier**       REP
Belle Fourche

### STATE SENATOR, LEGISLATIVE DISTRICT 12

You may vote for ONE

⬭ **John Claussen**        DEM

⬛ **Keith Paisley**       REP

### STATE REPRESENTATIVES, LEGISLATIVE DISTRICT 12

You may vote for any TWO

NOTE: If you are voting a party ticket and you cross over in this portion of the ballot, you must mark the names of all candidates for state representative for whom you wish to vote

⬛ **John R. McIntyre**     DEM

⬭ **Dick Casey**           DEM

⬛ **Hal Wick**            REP

⬛ **Judy Rost**           REP

### COUNTY TREASURER

You may vote for ONE

⬭ **Melanie Bliss**        DEM

⬛ **DeLoris Erickson**     REP

### COUNTY COMMISSIONER

You may vote for any TWO

NOTE If you are voting a party ticket and you cross over in this portion of the ballot, you must mark the names of all candidates for county commissioner for whom you wish to vote.

⬛ **Linda Allen**          DEM

⬭ **Jerry Noonan**         REP

⬛ **Robert Kolbe**         REP

### NON POLITICAL

### CONSERVATION DISTRICT SUPERVISOR (Urban Area)

You may vote for ONE

⬛ **Carol M. Sieg**

⬭ **Sandy Frentz**

## VOTE BOTH SIDES

OFFICIAL BALLOT
10-7
MINNEHAHA COUNTY, S.D.

046.

## Exhibit 33

**OFFICIAL GENERAL ELECTION BALLOT**      **DISTRICT 12**

| A MINNEHAHA COUNTY | B NOVEMBER 5, 1996 | C SOUTH DAKOTA |

**INSTRUCTIONS TO THE VOTER:**
To vote for a candidate (or group of presidential electors) whose name is printed on this ballot, completely blacken the oval ( ● ) next to the name. YOU MUST USE ONLY THE PENCIL PROVIDED TO MARK YOUR BALLOT!

**PARTY TICKET:**
To vote a Party Ticket, blacken the Party Oval ( ● ) completely. If you vote a Party Ticket and wish to vote for any candidate of another party or an independent candidate, completely blacken the oval ( ● ) next to that candidate's name.

◯ **LIBERTARIAN PARTY**

● **DEMOCRATIC PARTY**

✗ **REPUBLICAN PARTY**

### PRESIDENTIAL ELECTORS
You may vote for ONE slate

◯ **Browne & Jorgensen**
Electors     **LIB**
Deborah Barton, Rapid City
Spencer Nesson, Huron
Mary Ann Winter, Huron

◯ **Clinton & Gore**
Electors     **DEM**
James Beddow, Sioux Falls
Jim Abbott, Yankton
JoAnn Conroy, Batesland

◯ **Dole & Kemp**
Electors     **REP**
William J Janklow, Pierre
Joel Rosenthal Canton,
Carole Boos, Milbank

◯ **Perot & Campbell**
Electors     **IND**
affiliated with the Reform Party
Serena A Hyatt Summit
George M Hyatt, Summit
Everette Philen, Rosholt

◯ **Phillips & Knight**
Electors     **IND**
affiliated with the U S Taxpayers Party
Fred D Carpenter Tyndall
William L Scott Sioux Falls
James E Trimble, Watertown

◯ **Hagelin & Tompkins**
Electors     **IND**
affiliated with the Natural Law Party
James Balakier, Vermillion
Ann Stewart Balakier Vermillion
Margaret E Bhalara, Sioux Falls

### UNITED STATES SENATOR
You may vote for ONE

◯ **Tim Johnson**     **DEM**
Vermillion

◯ **Larry Pressler**     **REP**
Humboldt

### UNITED STATES REPRESENTATIVE
You may vote for ONE

◯ **Rick Weiland**     **DEM**
Sioux Falls

◯ **John R. Thune**     **REP**
Pierre

◯ **Stacey L. Nelson**     **IND**
Milbank
affiliated with the Reform Party

◯ **Kurt Evans**     **IND**
Wessington Springs
affiliated with no party

### PUBLIC UTILITIES COMMISSIONER
You may vote for ONE

◯ **James Christen**     **LIB**
Huron

◯ **Pam Nelson**     **DEM**
Sioux Falls

◯ **Roy Letellier**     **REP**
Belle Fourche

### STATE SENATOR, LEGISLATIVE DISTRICT 12
You may vote for ONE

◯ **John Claussen**     **DEM**

◯ **Keith Paisley**     **REP**

## VOTE BOTH SIDES

### STATE REPRESENTATIVES, LEGISLATIVE DISTRICT 12
You may vote for any TWO

NOTE If you are voting a party ticket and you cross over in this portion of the ballot, you must mark the names of all candidates for state representative for whom you wish to vote.

◯ **John R. McIntyre**     **DEM**

◯ **Dick Casey**     **DEM**

◯ **Hal Wick**     **REP**

◯ **Judy Rost**     **REP**

### COUNTY TREASURER
You may vote for ONE

◯ **Melanie Bliss**     **DEM**

◯ **DeLoris Erickson**     **REP**

### COUNTY COMMISSIONER
You may vote for any TWO

NOTE· If you are voting a party ticket and you cross over in this portion of the ballot, you must mark the names of all candidates for county commissioner for whom you wish to vote

◯ **Linda Allen**     **DEM**

◯ **Jerry Noonan**     **REP**

◯ **Robert Kolbe**     **REP**

### NON POLITICAL

### CONSERVATION DISTRICT SUPERVISOR (Urban Area)
You may vote for ONE

● **Carol M. Sieg**

◯ **Sandy Frentz**

OFFICIAL BALLOT
10-7
MINNEHAHA COUNTY, S.D.

046

## Exhibit 4

7

**OFFICIAL GENERAL ELECTION BALLOT**                    DISTRICT 12

| A MINNEHAHA COUNTY | B NOVEMBER 5, 1996 | C SOUTH DAKOTA |
|---|---|---|

**INSTRUCTIONS TO THE VOTER:**
To vote for a candidate (or group of presidential electors) whose name is printed on this ballot, completely blacken the oval ( ⬛ ) next to the name. YOU MUST USE ONLY THE PENCIL PROVIDED TO MARK YOUR BALLOT!

**PARTY TICKET:**
To vote a Party Ticket, blacken the Party Oval ( ⬛ ) completely. If you vote a Party Ticket and wish to vote for any candidate of another party or an independent candidate, completely blacken the oval ( ⬛ ) next to that candidate's name.

⬭ LIBERTARIAN PARTY

⬭ DEMOCRATIC PARTY

⬭ REPUBLICAN PARTY

___

**PRESIDENTIAL ELECTORS**
You may vote for ONE slate

⬭ **Browne & Jorgensen**
Electors                    LIB
Deborah Barton, Rapid City
Spencer Nesson, Huron
Mary Ann Winter, Huron

⬛ **Clinton & Gore**
Electors                    DEM
James Beddow, Sioux Falls
Jim Abbott, Yankton
JoAnn Conroy, Batesland

⬭ **Dole & Kemp**
Electors                    REP
William J. Janklow, Pierre
Joel Rosenthal, Canton
Carole Boos, Milbank

⬭ **Perot & Campbell**
Electors                    IND
affiliated with the Reform Party
Serenia A. Hyatt, Summit
George M. Hyatt, Summit
Everette Philen, Rosholt

⬭ **Phillips & Knight**
Electors                    IND
affiliated with the U.S. Taxpayers Party
Fred D. Carpenter, Tyndall
William L. Scott, Sioux Falls
James E. Trimble, Watertown

⬭ **Hagelin & Tompkins**
Electors                    IND
affiliated with the Natural Law Party
James Balakier, Vermillion
Ann Stewart Balakier, Vermillion
Margaret E. Bhatara, Sioux Falls

___

**UNITED STATES SENATOR**
You may vote for ONE

⬛ **Tim Johnson**            DEM
Vermillion

⬭ **Larry Pressler**        REP
Humboldt

___

**UNITED STATES REPRESENTATIVE**
You may vote for ONE

⬛ **Rick Weiland**          DEM
Sioux Falls

⬭ **John R. Thune**         REP
Pierre

⬭ **Stacey L. Nelson**      IND
Milbank
affiliated with the Reform Party

⬭ **Kurt Evans**            IND
Wessington Springs
affiliated with no party

___

**PUBLIC UTILITIES COMMISSIONER**
You may vote for ONE

⬭ **James Christen**        LIB
Huron

⬛ **Pam Nelson**           DEM
Sioux Falls

⬭ **Roy Letellier**        REP
Belle Fourche

___

**STATE SENATOR, LEGISLATIVE DISTRICT 12**
You may vote for ONE

⬛ **John Claussen**        DEM

⬭ **Keith Paisley**        REP

**VOTE BOTH SIDES**

___

**STATE REPRESENTATIVES, LEGISLATIVE DISTRICT 12**
You may vote for any TWO

NOTE: If you are voting a party ticket and you cross over in this portion of the ballot, you must mark the names of all candidates for state representative for whom you wish to vote

⬛ **John R. McIntyre**      DEM

⬛ **Dick Casey**           DEM

⬛ **Hal Wick**             REP

⬭ **Judy Rost**            REP

___

**COUNTY TREASURER**
You may vote for ONE

⬛ **Melanie Bliss**        DEM

⬭ **DeLoris Erickson**     REP

___

**COUNTY COMMISSIONER**
You may vote for any TWO

NOTE: If you are voting a party ticket and you cross over in this portion of the ballot, you must mark the names of all candidates for county commissioner for whom you wish to vote

⬛ **Linda Allen**          DEM

⬛ **Jerry Noonan**         REP

⬭ **Robert Kolbe**         REP

___

**NON POLITICAL**

___

**CONSERVATION DISTRICT SUPERVISOR (Urban Area)**
You may vote for ONE

⬛ **Carol M. Sieg**

⬭ **Sandy Frentz**

**OFFICIAL BALLOT**

## Exhibit 22

**OFFICIAL GENERAL ELECTION BALLOT**  DISTRICT 12

| [A] MINNEHAHA COUNTY | [B] NOVEMBER 5, 1996 | [C] SOUTH DAKOTA |
|---|---|---|

**INSTRUCTIONS TO THE VOTER:**
To vote for a candidate (or group of presidential electors) whose name is printed on this ballot, completely blacken the oval (⬤) next to the name. **YOU MUST USE ONLY THE PENCIL PROVIDED TO MARK YOUR BALLOT!**

**PARTY TICKET:**
To vote a Party Ticket, blacken the Party Oval (⬤) completely. If you vote a Party Ticket and wish to vote for any candidate of another party or an independent candidate, completely blacken the oval (⬤) next to that candidate's name.

◯ LIBERTARIAN PARTY

◯ DEMOCRATIC PARTY

◉ REPUBLICAN PARTY

---
**PRESIDENTIAL ELECTORS**
You may vote for ONE slate

◯ **Browne & Jorgensen**
Electors  LIB
Deborah Barton, Rapid City
Spencer Nesson, Huron
Mary Ann Winter, Huron

◯ **Clinton & Gore**
Electors  DEM
James Beddow Sioux Falls
Jim Abbott, Yankton
JoAnn Conroy, Batesland

⬤ **Dole & Kemp**
Electors  REP
William J Janklow, Pierre
Joel Rosenthal, Canton
Carole Boos Milbank

◯ **Perot & Campbell**
Electors  IND
affiliated with the Reform Party
Serena A Hyatt, Summit
George M Hyatt, Summit
Everette Philen Rosholt

◯ **Phillips & Knight**
Electors  IND
affiliated with the U S Taxpayers Party
Fred D Carpenter Tyndall
William L Scott Sioux Falls
James E Trimble Watertown

◯ **Hagelin & Tompkins**
Electors  IND
affiliated with the Natural Law Party
James Balakier, Vermillion
Ann Stewart Balakier, Vermillion
Margaret E Bhatara, Sioux Falls

---

**UNITED STATES SENATOR**
You may vote for ONE

⬤ **Tim Johnson**  DEM
Vermillion
◯ **Larry Pressler**  REP
Humboldt

**UNITED STATES REPRESENTATIVE**
You may vote for ONE

◯ **Rick Weiland**  DEM
Sioux Falls

◯ **John R. Thune**  REP
Pierre

⬤ **Stacey L. Nelson**  IND
Milbank
affiliated with the Reform Party

◯ **Kurt Evans**  IND
Wessington Springs
affiliated with no party

**PUBLIC UTILITIES COMMISSIONER**
You may vote for ONE

◯ **James Christen**  LIB
Huron
◯ **Pam Nelson**  DEM
Sioux Falls
⬤ **Roy Letellier**  REP
Belle Fourche

**STATE SENATOR, LEGISLATIVE DISTRICT 12**
You may vote for ONE

◯ **John Claussen**  DEM

◯ **Keith Paisley**  REP

**VOTE BOTH SIDES**

---

**STATE REPRESENTATIVES, LEGISLATIVE DISTRICT 12**
You may vote for any TWO

NOTE If you are voting a party ticket and you cross over in this portion of the ballot, you must mark the names of all candidates for state representative for whom you wish to vote.

◯ **John R. McIntyre**  DEM

◯ **Dick Casey**  DEM

◯ **Hal Wick**  REP

◯ **Judy Rost**  REP

**COUNTY TREASURER**
You may vote for ONE

◯ **Melanie Bliss**  DEM

◯ **DeLoris Erickson**  REP

**COUNTY COMMISSIONER**
You may vote for any TWO

NOTE: If you are voting a party ticket and you cross over in this portion of the ballot, you must mark the names of all candidates for county commissioner for whom you wish to vote

◯ **Linda Allen**  DEM

◯ **Jerry Noonan**  REP

◯ **Robert Kolbe**  REP

**NON POLITICAL**

**CONSERVATION DISTRICT SUPERVISOR (Urban Area)**
You may vote for ONE

◯ **Carol M. Sieg**

◯ **Sandy Frentz**