Rel: June 12, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2025-2026

_____

### SC-2025-0422
_____

**Maxwell "Mike" Blackmon**

**v.**

**Randy Brock**

**Appeal from Conecuh Circuit Court**
**(CV-22-6)**

McCOOL, Justice.[1]

_____

[1]This case was assigned to Justice McCool on March 3, 2026.

Maxwell "Mike" Blackmon has appealed from a judgment of the Conecuh Circuit Court ("the trial court") that denied his action contesting the November 2022 general election for the office of Conecuh County sheriff.

<u>Facts and Procedural History</u>

On November 8, 2022, voters in Conecuh County cast their votes in the general election. One of the races in that election was for the office of Conecuh County sheriff. Blackmon was the Republican candidate in that race, and Randy Brock was the Democratic candidate. Initially, the election was declared a tie, but, following a recount, the Conecuh County canvassing board declared that Brock had won the election by 2 votes -- 2,228 votes to 2,226 votes. Blackmon subsequently commenced an election contest in the trial court, arguing that the canvassing board had credited Brock with five illegal votes. Specifically, Blackmon alleged that three absentee ballots should have been excluded for "[n]oncompliance with Ala. Code § 17-11-9," and he alleged that two ballots that had been cast on election day were "mutilated ballots from which the intent of the voter could not possibly be ascertained." Blackmon also alleged that the canvassing board had failed to credit him with one legal vote during the

2

recount. Thus, according to Blackmon, if those illegal votes had not been counted and if the legal vote had been counted, he would have won the election, given that Brock's margin of victory was only two votes.

Pursuant to a court order, the parties met to examine the election materials in January 2023. See § 17-16-46, Ala. Code 1975. That same month, Brock was sworn in as the Conecuh County sheriff. There is no indication in the record that any activity occurred in this case, following the parties' review of the election materials, until March 13, 2024. On that date, the trial court entered an order stating that "[t]he court last heard from counsel regarding this case over one year ago and is unaware of the status." Thus, the trial court ordered the parties to file a joint "status of the case" within one week. One week later, the parties informed the trial court that they were "almost ready for trial," and they proposed that a status conference be held in May. However, the trial court did not schedule a status conference. Instead, on August 9, 2024, the trial court sent an email to the parties' counsel, "asking simply, 'Current status?'" Blackmon's counsel apparently did not see that email, and, on August 14, 2024, the trial court dismissed the case "for want of prosecution."

3

On Blackmon's motion, which he filed with the assistance of new counsel, the trial court vacated its dismissal order and reinstated the case on August 19, 2024. After several delays, the case finally proceeded to trial on March 4, 2025. Following the conclusion of that day's proceedings, the trial court entered a final judgment in favor of Brock. Blackmon then filed a postjudgment motion pursuant to Rule 59, Ala. R. Civ. P., in which he argued, in part, that the trial court had deprived him of "his due-process rights to fully present his evidence." The trial court found that Blackmon's motion to "resume trial" was well-taken and therefore vacated its judgment. The trial then continued, and concluded, on May 13, 2025.

On May 29, 2025, the trial court entered a final judgment in favor of Brock. That judgment states, in pertinent part:

"Ballots Rejected by Voting Machines

"During the statutory recount, the canvassing board considered three ballots which were rejected and not counted by the voting machines, and which were not reflected in the initial tied election results. Two of these ballots are challenged by Blackmon, which are ballots in which the circular Democratic Party symbol for straight-ticket voting was completely colored-in by the elector, rather than by coloring-in the oval space on the ballot, which the voting machines were designed to read. The canvassing board unanimously determined that the two electors intended to

4

cast a straight-ticket Democratic ticket, which resulted in two additional votes for Brock. Blackmon argues that it was not possible for the canvassing board to determine the clear intent of these two electors, and that the ballots should be rejected and not counted. The court notes that on each of these ballots the elector voted on several Constitutional amendments, but did not undertake to vote individually on any candidate for office. The colored-in Democratic Party symbol shows that it was colored-in with some care to color only within the circle.

"Section 17-12-13, Ala. Code 1975, provides that the ballot of an elector is not to be rejected for technical error unless it is impossible to determine the elector's intent. Similarly, the regulations promulgated by the Alabama Secretary of State pursuant to the Federal mandate under the Help America Vote Act, § 17-2-1, et. seq., Ala. Code 1975 (Title 820, Alabama Administrative Code, Section 820-1-02) provide that the rules shall be construed in favor of counting a vote (rather than rejecting the vote), and that a ballot which is rejected by a voting machine shall be counted if the voter clearly and without question indicates the candidate chosen. Under either of the foregoing tests, the court finds that these two electors clearly and without question intended to cast a straight-ticket Democratic Party ballot. The court rejects Blackmon's argument that the elector could have intentionally defaced the Democratic Party symbol, or was just 'doodling' on the ballot.

"On re-count, the canvassing board also counted a ballot for Blackmon in which the Republican Party symbol contained a large check-mark, rather than a colored-in oval.

"Absentee Votes

"Blackmon also questions the validity of several absentee votes which were cast in favor of Brock. (The court notes that the various 'ballot harvesting' statutes recently enacted by the Legislature were not in effect at the time of the

5

2022 General Election). Evidence was presented from some of the electors themselves, and from other individuals who assisted the electors in the absentee ballot process. The court finds that the absentee ballots in question are those from marginally-educated or illiterate voters. The test for determining the validity of an absentee ballot in Alabama is set forth in Williams v. Lide, 628 So. 2d 531 (Ala. 1993), which re-affirms a prior decision in Wells v. Ellis, 551 So. 2d 382 (Ala. 1989). The test holds that an absentee ballot is due to be counted and allowed if:

"A. The elector was not guilty of fraud, gross negligence or intentional wrongdoing; and

"B. The elector substantially complied with the essential requirements of the absentee voting law; and

"C. That any irregularities associated with the ballot do not adversely affect the sanctity of the ballot and the integrity of the election.

"Applying the foregoing test to the absentee ballots in question, the court finds and determines that the absentee ballots in question are due to be allowed and counted.

"One of the absentee ballots in question was cast by [P.W.], who testified at the March hearing. Her testimony was essentially that she had no knowledge of the absentee ballot in question. However, the demeanor of [P.W.] as a witness was evasive and wholly unpersuasive. The court gives no weight to the testimony of [P.W.], and declines to reject her absentee ballot on the basis of her subsequent testimony. The law disfavors allowing an elector to impeach his own ballot. 29 C.J.S. Elections, § 278.

"Blackmon had witness subpoenas issued for several witnesses in connection with the questioned absentee ballots.

6

Some of these witnesses appeared for trial, and some did not appear. At the request of Blackmon, the Court issued attachment writs for the production of the non-appearing witnesses, and the Sheriff was able to bring some of … these witnesses to court. However, at least two of the witnesses subpoenaed by Blackmon were never produced. The court was advised that one of these witnesses was in the hospital in Mobile, and the other could only be transported by ambulance. However, Blackmon did not advise the court of the anticipated testimony to be elicited from either of these witnesses, and no offer of proof was made as to what facts their testimony would have possibly established. Therefore, the court cannot treat these witnesses as indispensable.

"<u>Summary</u>

"The court finds from the evidence that all legal votes were properly and accurately counted and tabulated in the statutory re-count and that the results of the election were 2,228 for Brock and 2,226 for Blackmon.

"The court finds from the evidence that all legal votes were accurately counted and tabulated.

"The court finds from the evidence that no legal votes were improperly rejected in the statutory re-count.

"The court finds from the evidence that no illegal or unlawful votes were accepted or counted in the statutory re-count.

"Therefore, the court concludes that Blackmon has not met the burden of proof that the results of the statutory re-count are inaccurate, illegal or improper and that his contest is due to be rejected, overruled and denied.

"Although not essential to the court's findings above, the court notes that Blackmon finally brought his contest to trial

7

nearly two and one-half years after it was filed. The court does not understand the reasons for the inordinate delay. In the mind of the court, election contests are intended to be disposed of quickly and expeditiously, in order to preserve public confidence in the electoral process. This contest has dragged on so long that primary elections for the next election are only a year away. The interests of justice and public confidence in the electoral process would not be served if the results of an election were overturned two and one-half years after the election.

"It is therefore ORDERED, ADJUDGED AND DECREED that final judgment on the instant election contest is entered in favor of Brock and against Blackmon ...."

(Capitalization in original.) Blackmon filed a timely notice of appeal.

<u>Discussion</u>

Blackmon raises several grounds for reversing the trial court's judgment, but the heart of his appeal is that the court erred by refusing to exclude what, he says, were five illegal votes for Brock and by refusing to find that one legal vote for Blackmon had not been counted during the recount. As noted, the five allegedly illegal ballots consist of three absentee ballots and two ballots, which the parties refer to as the "logo ballots," that were cast on election day. Blackmon also argues that the trial court erred by admitting what, he says, was inadmissible evidence. We will address each of those arguments in turn. Before doing so, however, we address Brock's argument that the judgment is due to be

8

affirmed because, he says, Blackmon has failed to challenge one of the trial court's grounds for denying relief.

As noted, at the conclusion of its judgment, the trial court stated:

"Although not essential to the court's findings above, the court notes that Blackmon finally brought his contest to trial nearly two and one-half years after it was filed. The court does not understand the reasons for the inordinate delay. In the mind of the court, election contests are intended to be disposed of quickly and expeditiously, in order to preserve public confidence in the electoral process. This contest has dragged on so long that primary elections for the next election are only a year away. The interests of justice and public confidence in the electoral process would not be served if the results of an election were overturned two and one-half years after the election."

Brock argues that the foregoing paragraph was intended to serve as an "alternative legal ground[] for [the trial court's] judgment," and he notes that Blackmon has "completely ignore[d] this alternate basis for the … judgment." Brock's brief, p. 37. Thus, Brock contends that the judgment must be affirmed based on Blackmon's failure to challenge one of the trial court's grounds for denying relief. See Soutullo v. Mobile Cnty., 58 So. 3d 733, 739 (Ala. 2010) (noting that "the failure of the appellant to discuss in the opening brief an issue on which the trial court might have relied as a basis for its judgment[] results in an affirmance of that judgment"). Blackmon argues in response that "[t]he only ground

9

supporting the judgment was the factual finding that Brock received more votes," and he contends that "[t]he rest is dictum." Blackmon's reply brief, p. 9.

We agree with Blackmon. It is clear that the trial court's judgment was based on the court's conclusion that all legal votes -- and only legal votes -- had been counted in the November 2022 general election for the office of Conecuh County sheriff. Although the trial court expressed concern about the delay in the proceedings, the court explicitly stated that the delay was "not essential to the court's findings." (Emphasis added.) Thus, we do not interpret the foregoing paragraph from the trial court's judgment as stating an alternative ground upon which the court denied Blackmon's election contest, and we therefore will not affirm the judgment based on Blackmon's failure to respond to that paragraph.[2]

That said, this Court may affirm the trial court's judgment on any valid legal ground, even one the trial court rejected or did not consider. Murey v. City of Chickasaw, 385 So. 3d 903, 912 (Ala. 2023). However, we know of no legal basis for affirming the judgment based solely on the

---

[2]We also note that the blame for much of the delay in this case may be placed not solely on Blackmon but also on the trial court and Brock.

fact that the election at issue occurred more than three years ago and that a new election for the office of Conecuh County sheriff will occur mere months from now. It is true that "[t]he public has an interest in the speedy determination of election contests," Perloff v. Edington, 293 Ala. 277, 281, 302 So. 2d 92, 96 (1974), and, to that end, the statutes that govern election contests clearly anticipate that such contests will be resolved quickly. For example, an election contest involving the office of sheriff "must be commenced within 20 days after the result of the election is declared," § 17-16-49, Ala. Code 1975, and the contest "must be heard and tried in precedence of all other cases, civil or criminal, standing for trial in the court." § 17-16-56, Ala. Code 1975. In addition, a party who wishes to appeal from a final judgment in an election contest involving the office of sheriff must file the notice of appeal "within 14 days after rendition of the judgment." § 17-16-61, Ala. Code 1975.

Nevertheless, although election contests should be resolved quickly, nothing in the applicable statutes provides a specific time in which a trial court must rule on an election contest, and nothing in those statutes indicates that the mere passage of time is a valid basis for denying (or

11

affirming a judgment denying) an election contest.[3] To the contrary, § 17-16-59, Ala. Code 1975, states, in pertinent part:

> "If, on the trial of the contest of any election, either before the judge of probate or the circuit court, it shall appear that any person other than the one whose election is contested, received or would have received, had the ballots intended for the person and illegally rejected been received, the highest number of legal votes, <u>judgment must be given declaring such person duly elected</u>, and such judgment shall have the force and effect of investing the person thereby declared elected, with full right and title to have and to hold the office to which the person is declared elected."

(Emphasis added.)  Thus, § 17-16-59 provides in plain and unambiguous language that, if a plaintiff in an election contest proves that he or she is entitled to a judgment in his or her favor, then the trial court <u>must</u> enter such judgment, and nothing in that statute indicates that an election contest ceases to provide an avenue for relief after a certain amount of time has passed.[4]

---

[3]Of course, an election contest would necessarily be rendered moot by a subsequent election, but that is not the case here.  See <u>Gunaji v. Macias</u>, 130 N.M. 734, 737, 31 P.3d 1008, 1011 (2001) ("[A]n election contest becomes moot when the term for the corresponding office expires.").

[4]In <u>Nunley v. Abernathy</u>, 622 So. 2d 922, 923 (Ala. 1993), the appellee argued that former § 17-15-32, Ala. Code 1975 -- the predecessor to § 17-16-59 -- "provides only for a judgment 'declaring the [correct] person duly elected,' where the curative action involved is the <u>addition</u> of

For the foregoing reasons, this Court will not affirm the trial court's judgment based on the delay that has occurred in this case. Having made that determination, we turn to the merits of Blackmon's arguments.

I.

Blackmon argues that the trial court erred by refusing to exclude three absentee ballots that contained votes for Brock because, he says, those ballots were illegal. Evidence presented at trial indicated that those three absentee ballots had been supplied to voters P.W., T.P., and J.H. We will address Blackmon's arguments as to each of the three absentee ballots in turn.

A. P.W.'s Absentee Ballot

Blackmon argues that the trial court erred by refusing to exclude P.W.'s ballot because she "testified unequivocally that she did not sign any absentee ballot affidavit and did not personally cast an absentee

---

legal votes wrongfully not counted, rather than, as here, the subtraction of illegal votes that should never have been counted." This Court rejected that argument, holding that former § 17-15-32 -- now § 17-16-59 -- "offer[s] the remedy of 'declaring the [correct] person duly elected'" and that this remedy applies with equal force in cases in which "the contestant successfully demonstrates that, ignoring (or 'subtracting') illegal votes, he or she actually received the majority of the votes cast." 622 So. 2d at 923.

ballot in the 2022 election, ... despite one being received and counted for Brock in her name." Blackmon's brief, p. 30. Blackmon correctly notes that P.W. did in fact provide such testimony. However, the trial court made the following finding regarding P.W.'s testimony:

> "One of the absentee ballots in question was cast by [P.W.], who testified at the March hearing. Her testimony was essentially that she had no knowledge of the absentee ballot in question. However, the demeanor of [P.W.] as a witness was evasive and wholly unpersuasive. The court gives no weight to the testimony of [P.W.], and declines to reject her absentee ballot on the basis of her subsequent testimony."

"It is axiomatic that the credibility of witnesses is a matter within the exclusive province of the [finder of fact]." Wiggins v. Mallard, 905 So. 2d 776, 783 (Ala. 2004). Thus, although Blackmon argues that P.W.'s testimony "was anything but evasive," Blackmon's brief, p. 30 n.7, that was a question for the trial court to decide, and this Court cannot disturb that finding. "'The credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. [Alabama appellate courts] cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses.'" Ex parte Loggins, 771 So. 2d 1093, 1106 (Ala. 2000) (citation omitted). Accordingly, Blackmon has not demonstrated that the trial court erred by refusing to exclude P.W.'s ballot. See Eubanks v.

14

Hale, 752 So. 2d 1113, 1148 (Ala. 1999) (opinion on return to second remand) ("Given that we were not present in the courtroom to see Ms. Burrell and hear her testimony, we cannot say that the trial judge's finding that her testimony was not credible is plainly and palpably wrong. Therefore, we need not engage in further consideration of her testimony or the votes about which she testified.").

### B. T.P.'s Absentee Ballot

Blackmon argues that the trial court erred by refusing to exclude T.P.'s ballot because, he says, T.P.'s "absentee ballot affidavit … was undisputedly false." Blackmon's brief, p. 31. In the affidavit that he submitted with his application for an absentee ballot, T.P. attested that he needed an absentee ballot because he was "physically incapacitated and w[ould] not be able to vote in person on election day." See § 17-11-3(a)(2), Ala. Code 1975. Blackmon correctly notes, though, that there was evidence indicating that T.P. was not unable to vote in person on election day due to physical incapacity. Thus, according to Blackmon, T.P.'s ballot was illegal and should have been excluded.

Brock correctly argues, however, that Blackmon did not raise this specific argument at trial. Blackmon certainly challenged the legality of

T.P.'s ballot at trial, but he did so on the grounds that T.P. was not the person who had marked his ballot, that T.P. had not personally subscribed to the oath therein, that T.P. had not personally sealed his ballot or endorsed the return envelope, that T.P. had not personally signed the voter affidavit, that T.P. had not personally mailed or hand-delivered his ballot, and that "neither two witnesses nor a notary public [had] witnessed [T.P.'s] signature to the affidavit (because he did not personally sign it)." Thus, although Blackmon asserted multiple grounds for finding that T.P.'s ballot was illegal, he did not include among those grounds the argument that T.P. had provided a false reason for needing an absentee ballot, which is the argument he has raised on appeal. Notably, in his reply brief, Blackmon does not dispute Brock's contention that he did not raise this specific argument at trial.

It is well settled that "'the trial court will not be put in error on grounds not assigned at trial.'" Ex parte Coulliette, 857 So. 2d 793, 794 (Ala. 2003) (citation omitted). In the trial court, Blackmon asserted multiple grounds for finding that T.P.'s ballot was illegal and therefore should be excluded, but those grounds did not include the argument that T.P. had provided a false reason for needing an absentee ballot. Thus,

16

this Court will not hold the trial court in error for refusing to exclude T.P.'s ballot on that ground.

## C. J.H.'s Absentee Ballot

Blackmon argues that the trial court erred by refusing to exclude J.H.'s ballot because, he says, the evidence unequivocally indicated that she did not apply for an absentee ballot and was not even aware that an absentee ballot had been "cast in her name." Blackmon's brief, p. 33. Blackmon also notes that the affidavit that J.H. submitted with her absentee ballot indicated that she needed an absentee ballot because she was "physically incapacitated and w[ould] not be able to vote in person on election day." According to Blackmon, however, the evidence indicated that J.H. was not physically incapacitated at the time of the election. For those reasons, Blackmon contends that "the illegality of [J.H.'s] purported absentee ballot … was legally established." Id.

It is true, as Blackmon contends, that J.H. testified that she did not apply for an absentee ballot for the November 2022 general election and that she was not aware that a ballot had been cast in her name. However, J.H.'s brother, M.H., testified that his wife's cousin has long assisted the siblings in applying for their absentee ballots and that he and J.H. then

17

mark and sign their own ballots with the cousin's assistance. Thus, there was conflicting evidence as to whether J.H. legally cast a vote in the November 2022 general election, and it appears that the trial court found M.H.'s testimony to be persuasive because the court concluded that J.H. "was not guilty of fraud, gross negligence or intentional wrongdoing" and that she had "substantially complied with the essential requirements of the absentee voting law." Those findings are supported by the evidence and therefore will not be disturbed by this Court. Espinoza v. Rudolph, 46 So. 3d 403, 412 (Ala. 2010). As for his argument challenging J.H.'s purported physical incapacitation, Blackmon did not raise that argument at trial as a basis for excluding J.H.'s ballot and therefore cannot obtain relief on that argument on appeal. Ex parte Coulliette, supra.

II.

Blackmon argues that the trial court erred by admitting one of Brock's exhibits into evidence -- namely, "a purported 'certification' by the canvassing board of precinct-by-precinct recount results." Blackmon's brief, p. 33. In short, Blackmon argues that Brock presented that exhibit in an attempt to refute what, Blackmon says, was "uncontroverted" evidence that he (Blackmon) "had been deprived of a

18

legal vote" from one precinct.  Id., p. 34.  According to Blackmon, that exhibit was inadmissible for several reasons, and he argues that its admission was not harmless error.  We do not address the merits of Blackmon's arguments, though, because he failed to preserve them for appellate review.  Some brief procedural history will demonstrate that failure.

Brock proffered the exhibit for admission into evidence near the close of the March 4, 2025, hearing, and Blackmon raised no objection to its admission at that time.  Following that hearing Brock filed a brief with the trial court, and he attached the exhibit to his brief.  Blackmon also filed a brief with the trial court and included a written objection to the exhibit at that time.  By that point, though, the exhibit was already in evidence, which meant that Blackmon was "ask[ing] the [trial] court to exclude evidence that [had] already [been] introduced."  Robinson v. Bank of Heflin, Inc., 540 So. 2d 45, 48 (Ala. 1988).  Thus, Blackmon's objection came too late.[5]  See Baldwin Cnty. Elec. Membership Corp. v.

_____

[5]Blackmon contends that the trial court "initially admitted … the exhibit in its first final judgment for Brock."  Blackmon's brief, p. 35.  It is true that the trial court stated in that judgment that Blackmon's "objection to admissibility is hereby denied."  (Capitalization omitted.)

19

_City of Fairhope_, 999 So. 2d 448, 455 (Ala. 2008) ("In order for Baldwin's objection to have been timely, it ha[d] to have been '"raised at the point during trial when the offering of improper evidence [was] clear."'" (quoting _HealthTrust, Inc. v. Cantrell_, 689 So. 2d 822, 827 (Ala. 1997), quoting in turn Charles W. Gamble, _McElroy's Alabama Evidence_ § 426.01(3) (5th ed. 1996))).

Blackmon attempts to skirt his failure to timely object to Brock's exhibit by arguing that the "prior admission [of the exhibit] had been vacated by the [trial] court." Blackmon's brief, p. 34. According to Blackmon, when the trial court vacated the final judgment that it had entered after the March 4, 2025, hearing, the court's "vacatur of that judgment meant the exhibit was no longer in evidence." _Id._, p. 35. We would be inclined to agree with Blackmon if the trial court had granted a _new_ trial, but that is not what occurred. Instead, it is clear from the record that the trial court and the parties treated the May 13, 2025, hearing as a _continuation_ of the same trial. Indeed, in his postjudgment motion, Blackmon asked the trial court to "resume trial," and the court

---

However, the record clearly indicates that the trial court had already admitted the exhibit into evidence during the March 4, 2025, hearing.

stated in its order granting that motion that it was "resum[ing] trial." Moreover, we note that, during the May 13, 2025, hearing, Blackmon did not reintroduce the evidence he had presented during the March 4, 2025, hearing, yet he relies extensively on that evidence in support of the arguments he has raised on appeal. In other words, it is evident that Blackmon does not believe that the evidence that was admitted during the first hearing had to be readmitted during the second hearing.

In short, we reject Blackmon's argument that any of the evidence admitted during the March 4, 2025, hearing -- including the exhibit he challenges on appeal -- was "no longer in evidence" once the trial court granted his postjudgment motion. Thus, because Blackmon did not object to that exhibit when Brock proffered it for admission, he has waived any challenge to its admissibility and, accordingly, is not entitled to relief on this argument. <u>Baldwin Cnty. Elec. Membership Corp.</u>, <u>supra</u>.

## III.

Blackmon argues that the trial court "ignored conclusive evidence that a legal vote for [him], cast by a visually impaired voter, was illegally rejected." Blackmon's brief, p. 41. In support of his argument, Blackmon

21

notes that, on election day, there were 198 votes cast for the office of sheriff in the Sandcut Fire voting precinct and that, on election day, 178 of those votes were for him and 20 were for Brock. Blackmon argues, though, that during the recount he was credited with only 177 votes. According to Blackmon, the allegedly missing vote was from a special ballot used by visually impaired voters, and he contends that the evidence indicated that the ballot "went uncounted by the machine during the recount" and "was never hand-counted and added back to [his] recount total." Id., pp. 41, 42. The trial court did not discuss this specific issue in its judgment, but the court did find that "all legal votes were properly and accurately counted and tabulated."

There is evidence to support the trial court's finding. Specifically, Judge Steven Fleming, the Conecuh County probate judge, testified emphatically that "a handicap vote at Sandcut" had been included in the recount, thus giving Blackmon 178 votes from the Sandcut Fire precinct. Indeed, Judge Fleming testified that, "[w]ithout a doubt," the "handicap vote" in favor of Blackmon had been included in the recount. Granted, Blackmon presented some documentary evidence that arguably conflicted with Judge Fleming's testimony. However, it was the trial

court's role, as the finder of fact, to resolve any conflicts in the evidence, Terrell v. Joshua, 390 So. 3d 1043, 1058 (Ala. 2023), and the court clearly resolved the conflicting evidence on this issue in favor of Brock. Because the trial court's finding is supported by evidence in the record, this Court will not disturb the finding. Espinoza, supra. Thus, this argument does not entitle Blackmon to relief.

IV.

Blackmon argues that the trial court erred by refusing to exclude the two "logo ballots." A brief description of those ballots is necessary to our analysis.

During the November 2022 general election, ballots in Alabama included not only races for various state and local offices but also several proposed amendments to the Alabama Constitution. At the top of the ballots was the following statement:

"INSTRUCTIONS TO THE VOTER

"TO VOTE YOU MUST BLACKEN THE OVAL ⬭
COMPLETELY! ⬬ "

Each of the voters who cast the two "logo ballots" voted for at least one proposed constitutional amendment by blackening the oval to the left of

"YES."[6] Neither voter cast a vote for any specific office by blackening the oval to the left of a candidate's name, and, in the straight-party-voting section of the ballot, neither voter blackened the oval to the left of any of the three political parties on the ballot -- the Alabama Democratic Party, the Alabama Republican Party, and the Libertarian Party of Alabama. However, to the right of each of those parties was the party's emblem, or what Blackmon and Brock refer to as the political parties' "logos," and the voters who cast the "logo ballots" colored or scribbled over the Democratic Party's "logo." Thus, the trial court found that those ballots had been properly counted as votes for Brock, concluding that the voters who cast those ballots had "clearly and without question intended to cast a straight-party ticket Democratic Party ballot." Blackmon argues on appeal that the trial court erred by refusing to exclude the two "logo ballots" because, he says, the voters' intent is not clear.

Before addressing the merits of Blackmon's argument, we first answer a threshold question posed by Brock: "[Does] this Court review[] [the trial court's] decision <u>de novo</u> or under the 'clearly erroneous'

---

[6]One voter voted only on the first proposed constitutional amendment, which was the only one that appeared on the front of the ballot; the other voter voted on all of them.

standard as a finding of fact as to these voters' intent[?]"  Brock's brief, p. 54.  According to Brock, we should apply the latter standard of review, though he argues that the trial court's finding should be affirmed under either standard.  Blackmon argues, on the other hand, that our review is de novo.  We agree with Blackmon.

In Ex parte Cain, 838 So. 2d 1020, 1026 (Ala. 2002), this Court stated:

> "If ... a [finding of fact] is based entirely on evidence in writing -- affidavits, written discovery, exhibits, or the like -- ..., which an appellate court can judge as well as the trial court, an appellate court will review the fact-finding de novo, with no presumption of correctness.  Ex parte Horn, 718 So. 2d 694 (Ala. 1998), and Lilly v. Palmer, 495 So. 2d 522 (Ala. 1986).  Only if such a fact-finding is based, at least in substantial part, on oral testimony the appellate court cannot observe as well as the trial court, will the fact-finding be accorded the ore tenus presumption of correctness."

In this case, the trial court certainly heard oral testimony, but its finding of fact as to the intent of the voters who cast the two "logo ballots" was based solely on the court's review of those ballots.  Indeed, Brock concedes that this specific finding of fact by the trial court did not hinge on any oral testimony and, instead, was based on the court's "own independent analysis of these two ['logo ballots.']  Brock's brief, p. 48.  Thus, the trial court was in no better position than this Court to make a

determination regarding the intent of the voters who cast the two "logo ballots." As the Utah Supreme Court has explained:

> "In applying the rule of voter intent …, we do not exercise the same deference toward the findings and conclusions of the trial judge as is appropriate in a case where the resolution of the controversy is dependent upon evidence heard in the trial court. In contrast, the resolution of this appeal turns solely on the meaning and effect of … the ballots as to which the trial court has no advantaged position over this Court."

Mosier v. Gilmore, 635 P.2d 55, 59 (Utah 1981). See also In re Election of U.S. Representative for Second Cong. Dist., 231 Conn. 602, 658, 653 A.2d 79, 108 (1994) ("[W]e must determine de novo the voter's intent in casting or marking [a] … ballot."); McCavitt v. Registrars of Voters of Brockton, 385 Mass. 833, 839, 434 N.E.2d 620, 625 (1982) (noting that "[t]he determination of the legal effect of ballots is a question of law" and that, as a result, an appellate court considers the issue de novo based on its review of the ballots); and Duffy v. Mortenson, 497 N.W.2d 437, 439 n.6 (S.D. 1993) (noting that "'considering the effect of a mark upon a ballot'" "is a process that involves a question of law'" (citation omitted)).[7]

_____

[7]Some jurisdictions have reached the opposite conclusion, holding that the question of a voter's intent, as determined from the face of a ballot, is a question for the finder of fact to answer and that an appellate court will defer to that finding. See, e.g., State ex rel. Bowling v.

26

We recognize, of course, that questions of intent are typically questions for the finder of fact, whose findings will rarely, if ever, be disturbed on appeal. Flickinger v. King, [Ms. SC-2024-0153, Aug. 22, 2025] ___ So. 3d ___, ___ n.6 (Ala. 2025). However, applying that principle makes little sense in a case like this, in which the finding of intent (or lack of intent) must necessarily be based solely on a review of the marks that two unidentified voters made on their ballots -- marks that, as noted, the trial court is not any better suited to review than this Court. Accordingly, we do not afford a presumption of correctness to the trial court's finding regarding the "logo ballots" and, instead, review this issue de novo. Having made that determination, we proceed to the merits of Blackmon's argument.

In 2003, the Alabama Legislature enacted § 17-2-4(f), Ala. Code 1975, which states: "The Secretary of State by administrative rule shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of

---

Greenbrier Cnty. Comm'n, 212 W. Va. 647, 652, 575 S.E.2d 257, 262 (2002). Respectfully, we fail to see the necessity for such deference in this situation because, as noted, the trial court is in no better position than this Court to examine the two "logo ballots" for the purpose of determining the voters' intent.

voting system used in the state."   In accordance with that statute, the

Secretary of State promulgated Rule 820-2-1-.02 of the Alabama

Administrative Code, which is entitled "Definition of A Vote."  Paragraph

5 of that rule states:

> "The following special rules govern the manual review of a vote cast on an optical scan voting system where the ballot upon which the vote is cast is rejected or otherwise not read by the tabulating machine and not spoiled:
>
>> "(a) If the voter fills in the oval or completes the arrow adjacent to the name of a candidate printed on the ballot and fills in the oval or completes the arrow adjacent to the write-in space for the same office, the properly cast vote for the candidate on the ballot shall be counted and the write-in vote shall be ignored.
>>
>> "(b) If it appears that there is a properly cast vote and that a stray mark has caused the tabulating machine to reject the vote for the office, the properly cast vote shall be counted and the stray mark shall be ignored.
>>
>> "(c) <u>If a voter marks his or her ballot in a manner other than that specified by law and this rule</u>, the vote shall be counted if the voter <u>clearly and without question</u> indicates the candidate or answer to a question for which the voter desires to vote.  The following are specific but non-exclusive situations where a vote should not be or should be counted:
>>
>>> "1. If a voter marks in the same manner  more  names  than  there  are

28

persons to be elected to an office, then no vote shall be counted for that office. If a voter marks in the same manner more answers than a particular question calls for, then no vote shall be counted for that question.

"2. If a voter marks with a cross, 'X,' checkmark, or other similar mark within the oval or arrow adjacent to the name of the candidate or answer to a question for which the voter desires to vote, the vote shall be counted. Underlining or circling the candidate or answer to a question for which the voter desires to vote also constitutes a countable vote. An apparent erasure of an aforementioned mark shall not be counted if the voter makes another mark in accordance with this rule or other applicable law."

(Emphasis added.)

Blackmon argues that the trial court erred by finding that the voters who cast the two "logo ballots" had "clearly and without question intended to cast a straight-party ticket Democratic Party ballot." In support of that argument, Blackmon notes that those two voters clearly "knew how to properly cast a vote, as demonstrated by their properly filling in the oval next to their choice on a constitutional amendment." Blackmon's brief, p. 43. Yet, Blackmon notes, in the straight-party-

29

voting section of their ballots, those voters chose not to blacken the oval

to the left of "ALABAMA DEMOCRATIC PARTY" but, instead, chose to

color or scribble over the Democratic Party's "logo." Thus, according to

Blackmon,

> "it is impossible to know 'clearly and without question' the intent of a voter from a scribbled-over logo, especially where the voter's knowledge of how to properly cast a vote -- by filling in the appropriate oval -- is obvious from the voter's doing so in another race or question on the same ballot."

Id., p. 47.

Brock argues, as another threshold issue, that the standard for

determining whether the two "logo ballots" should be excluded is not

found in Rule 820-2-1-.02 but, instead, is found in § 17-12-13, Ala. Code

1975, which states:

> "Except where precinct ballot counters are used in counting the ballots, the inspector must take the ballots, one by one, from the box in which they have been deposited, at the same time reading aloud the names of the persons voted for and the office for which such persons are voted for; the inspector must separately keep a calculation of the number of votes each person receives and for what office he or she receives them; if the elector has marked more names than there are persons to be elected to an office, or if for any reason it is impossible to determine the elector's choice for any office to be filled, the ballot shall not be counted for such office, but this shall not vitiate the ballot so far as properly marked, nor shall any ballot be rejected for any technical error which does not make it impossible to determine the elector's choice, and

30

nothing in the election law shall be construed so as to prevent any elector from voting for any qualified person other than those whose names are printed on the ballot."

According to Brock, the standard for determining whether to exclude the two "logo ballots" must be governed by § 17-12-13 because Rule 820-2-1-.02(1)(a) explicitly provides that "[t]his rule shall not supersede any other law" and, moreover, because it is well settled that "'[t]he provisions of a statute will prevail in any case of a conflict between a statute and an agency regulation.'" Davis v. Bennett, 154 So. 3d 114, 124 (Ala. 2014) (citation omitted). Thus, in Brock's view, the question is not whether the voters who cast the "logo ballots" "clearly and without question indicate[d] the candidate … for which the voter[s] desire[d] to vote," Rule 820-2-1-.02(5)(c), but, instead, is whether it is "impossible to determine" their choices. § 17-12-13. Brock contends that determining which standard applies is crucial because, he says, the standard in Rule 820-2-1-.02(5)(c) is "stricter" than the standard in § 17-12-13. Brock's brief, p. 54.

Although the language used in Rule 820-2-1-.02(5)(c) is different from the language used in § 17-12-13, we are not convinced that the two standards are necessarily different in substance. Rule 820-2-1-.02(5)(c)

31

provides that an improperly marked ballot shall be counted "if the voter clearly and <u>without question</u> indicates the candidate or answer to a question for which the voter desires to vote." (Emphasis added.) Conversely, then, an improperly marked ballot shall <u>not</u> be counted under the rule if there <u>is</u> a question as to the voter's intent. Section 17-12-13 provides that an improperly marked ballot shall be rejected if it is "impossible to determine the elector's choice." Conversely, then, an improperly marked ballot shall <u>not</u> be rejected under the statute if it is <u>not</u> impossible to determine the elector's choice. In other words, although phrased differently, Rule 820-2-1-.02(5)(c) and § 17-12-13 both appear to essentially provide that an improperly marked ballot shall be counted so long as the voter's intent is clear. That said, if there is a conflict between the standard in Rule 820-2-1-.02(5)(c) and the standard in § 17-12-13, we would be required to apply the standard in the statute, <u>Davis</u>, <u>supra</u>, and, if the two standards mean essentially the same thing, then applying the statute should lead to the same result as applying the rule. Thus, we will review the "logo ballots" by applying the standard in § 17-12-13, i.e., whether it is "impossible to determine the elector's choice."

As noted, on each of the two "logo ballots," in the straight-party-voting section, the voter did not blacken the oval to the left of any of the three political parties listed on the ballot. Instead, the voter colored or scribbled over the Democratic Party's "logo," which was located to the right of the party's name. The voters also did not blacken the oval to the left of any of the numerous candidates on the ballot. Thus, the trial court found that, by coloring or scribbling over the Democratic Party's "logo," the voters had clearly intended to cast a straight-party vote for the Democratic Party. Brock agrees with that finding, and he notes that, pursuant to Rule 820-2-1-.02(5)(c)2., a voter may cast a "countable vote" without blackening the oval to the left of his or her choice because the rule expressly provides that "[u]nderlining or circling the candidate or answer to a question for which the voter desires to vote also constitutes a countable vote." According to Brock, coloring or scribbling over a political party's "logo" is akin to underlining or circling the party's name. Finally, Brock argues that,

> "[i]f these electors did not intend a straight party ticket vote by their markings, the only other way to read their ballots would require an assumption that they came to the polls with no intention to vote, and did not vote, for any candidate in any election. Such an alternative reading would be irrational."

33

Brock's brief, p. 57.

The problem with the trial court's finding and with Brock's argument is that they have focused solely on the markings on the Democratic Party's "logo" and have ignored the other markings on the "logo ballots." As noted, the voters who cast the two "logo ballots" properly marked their votes for one or more of the proposed constitutional amendments by blackening the oval to the left of "YES," just as the statement at the top of the ballots instructed them to do. It is therefore clear that those voters knew how to properly mark their ballots, yet, in the straight-party-voting section of the ballots, they did not cast a straight-party vote for the Democratic Party by blackening the oval to the left of "ALABAMA DEMOCRATIC PARTY." The fact that those voters properly marked certain sections of their ballots is significant because it demonstrates their knowledge of the voting instructions and their ability to properly cast a vote, which in turn raises questions about the purpose of the improper marks they made on the Democratic Party's "logo."

We find support for this conclusion in McIntyre v. Wick, 558 N.W.2d 347 (S.D. 1996), in which the South Dakota Supreme Court considered

whether a ballot constituted a straight-party vote for the Republican Party.  Similar to § 17-12-13, a South Dakota statute in effect at that time provided that a ballot could not be counted if it was "impossible to determine the voter's choice."  S.D. Codified Laws, § 12-20-7.  Like the ballots at issue here, the straight-party-voting section of the ballot in McIntyre contained an oval to the left of each of the three political parties on the ballot -- Libertarian, Democratic, and Republican -- and, like the ballots at issue here, the ballot in McIntyre contained instructions for the voter to cast his or her vote by "completely blacken[ing] the oval" to the left of his or her choice.  558 N.W.2d at 361.  However, the voter in McIntyre did not blacken the oval to the left of "REPUBLICAN PARTY" but, instead, placed an "X" inside the oval.  In and of itself, that "X," though not in accord with the ballot instructions, would probably have sufficed as a straight-party vote for the Republican Party, and that is the argument one of the Republican candidates made on appeal.  However, the South Dakota Supreme Court rejected that argument, noting that the "X" the voter had placed in the oval was not "consistent with the other marks placed on the ballot by the voter" because the voter had "completely darkened the oval in front of ... the constitutional

35

amendments … on the ballot." Id. Thus, the court held that the ballot should not have been counted as a vote for the Republican candidates.

Courts in other jurisdictions have likewise taken into account the fact that a voter had properly marked certain parts of a ballot when attempting to ascertain the intent of an improper mark on another part of the ballot. See, e.g., In re Primary Election Ballot Disputes 2004, 857 A.2d 494, 504 (Me. 2004) (holding that an improper mark in the oval next to a candidate's name did not constitute a vote for that candidate, "[g]iven the voter's demonstrated ability to comply with the instructions and fully darken ovals when voting" in other races); Edgmon v. State, Office of Lieutenant Governor, Div. of Elections, 152 P.3d 1154, 1158 (Alaska 2007) (refusing to conclude that an improper mark next to a candidate's name constituted a vote for that candidate because "[a] review of the entire ballot … suggest[ed] that the voter understood the rules and used a completely shaded oval … to indicate a vote" in other races); Spaeth v. Kendall, 245 Mont. 352, 354, 801 P.2d 591, 593 (1990) (noting, in rejecting the appellant's argument that an improperly marked ballot should have been counted as a vote for him, that "[t]he method of marking the ballot [was] clearly explained and demonstrated on the ballot" and

that the voter had "followed these instructions appropriately in the only other race in which a vote was cast").  See also Sprague v. Town Council of Town of West Warwick, 42 R.I. 8, 104 A. 834, 835 (1918) (excluding a ballot because the voter had not placed a mark in the circle next to the Republican Party, where the mark should have been placed, and instead had placed the mark "entirely without the circle and in the blank space between the circle and the eagle[, i.e., the Republican Party 'logo']").

Similarly, on the two "logo ballots" at issue in this case, the markings the voters made on the Democratic Party's "logo" are not consistent with the markings they made on the proposed constitutional amendments -- the latter of which fully comply with the instructions for casting a proper vote.  That inconsistency calls into question the intent of the voters as to each of those ballots and raises the following question: Why did the voters properly mark their votes on the proposed constitutional amendments by blackening the ovals to the left of their choices but not blacken any ovals in the straight-party-voting section of the ballot?  Did they intend for their act of coloring or scribbling over the Democratic Party's "logo" to constitute a straight-party vote for the Democratic Party, or were the marks on the "logo" mere "scribblings" or

37

perhaps even a defiant "scratching out" of the "logo" of the political party they did <u>not</u> prefer?  If they intended the former, then why not simply blacken the appropriate oval, just as they did when voting on the proposed constitutional amendments?  Only those voters can answer that question with certainty, and the fact that they properly marked their ballots in some places certainly raises speculation as to their intent in coloring or scribbling over the Democratic Party's "logo."

As noted, Brock argues that it is illogical to believe that a voter would travel to a polling location without the intention of casting any votes whatsoever, but that is not what happened in this case.  In this case, the voters clearly and properly marked their votes on at least one proposed constitutional amendment, and it is <u>not</u> illogical to believe that a voter would travel to a polling location with the intention of voting only on proposed constitutional amendments.

These questions that arise from the "logo ballots" lead to the inevitable conclusion that, taking each of those ballots as a whole, it is "impossible to determine" whether the voters who cast the ballots intended to cast a straight-party vote for the Democratic Party.  § 17-12-13.  Because the voters knew how to -- and did -- <u>properly</u> mark their

38

ballots on the proposed constitutional amendments, it would require too much speculation to conclude that they intended for the <u>improper</u> marks they made on the Democratic Party's "logo" to constitute such a vote. <u>See</u> <u>Mosier</u>, 635 P.2d at 58 (noting that "the voter's intent can only be honored if it is susceptible of determination without speculation"). We therefore hold that the trial court erred by refusing to exclude the two "logo ballots," and that error was not harmless because, when those two votes are taken from Brock, the result of the election is a tie, with each candidate receiving 2,226 votes. Accordingly, we reverse the trial court's judgment and remand the case for further proceedings consistent with this opinion.[8]

---

[8]In its judgment, the trial court stated: "On re-count, the canvassing board also counted a ballot for Blackmon in which the Republican Party symbol contained a large check-mark, rather than a colored-in oval." That statement appears to reflect the trial court's belief that, if the two "logo ballots" at issue should be excluded, then one vote for Blackmon should also be excluded, which would mean that Brock still won the election by one vote.

However, the evidence indicated that the voter who cast the "check-mark" ballot in favor of Blackmon had placed a check mark "over the bubble," i.e., inside the <u>oval</u>, not over the Republican Party's "logo." <u>See</u> Rule 820-2-1-.02(5)(c)2. (providing that "a … checkmark … within the oval … adjacent to the name of the candidate … shall be counted"). Moreover, that ballot was not admitted into evidence, so there is no way for this Court to compare that ballot to the two "logo ballots."

We recognize that Rule 820-2-1-.02(1)(c) provides that "[t]his rule shall be construed in favor of counting a cast vote." We also recognize that

> "the right of citizens to vote is perhaps the most basic and cherished right of our democratic system, and we must construe the voting laws 'in order to effectuate the legislative purpose of protecting and furthering a citizen's right to vote,' Wells v. Ellis, 551 So. 2d 382, 383 (Ala. 1989), so long as the sanctity of the election process is preserved."

Eubanks, 752 So. 2d at 1150 (opinion on return to second remand) (footnote omitted). Thus, as this Court has previously observed,

> "'[w]e must tread carefully on that right or risk the unnecessary and unjustified muting of the public voice. By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right.'"

Wells v. Ellis, 551 So. 2d 382, 384 (Ala. 1989) (quoting Boardman v. Esteva, 323 So. 2d 259, 263 (Fla. 1975)).

At the same time, there is a "strong public policy that the rightful winner of an election should occupy the office to which he was elected," Eubanks, 752 So. 2d at 1136 (opinion on return to remand), and we cannot ignore the fact that the Legislature has expressly provided that an improperly marked ballot "shall not be counted" if it is "impossible to determine the elector's choice." § 17-12-13. Given that the voters who

40

cast the two "logo ballots" properly marked their votes on the proposed constitutional amendments, it is impossible to say that they made a choice to cast a straight-party vote for the Democratic Party by coloring or scribbling over the Democratic Party's "logo." If those voters did intend to cast such a vote, it is unfortunate that their ballots must be excluded, but that unfortunate result is the consequence of their own choices not to follow the instructions printed at the top of their ballots -- instructions that they clearly followed on other parts of the ballot. Thus, if those voters' voices have now been "'mut[ed]'" by the exclusion of their ballots, it is they who have muted them, not this Court. Wells, 551 So. 2d at 384 (citation omitted).

## Conclusion

For the reasons set forth herein, we reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Stewart, C.J., and Shaw and Bryan, JJ., concur.

Sellers and Mendheim, JJ., dissent.

Wise, Cook, and Parker, JJ., recuse themselves.

41